# Exhibit A

AGREEMENT made the 15th day of June , 1977,
by and between ZEMBU PRODUCTIONS, INC., c/o Marshall Morris
Powell & Silfen, 130 West 57th Street, New York, New York
10019 (hereinafter referred to as "Producer") and JAMES
MTUME professionally known as "MTUME", P.O. Box 1093, Newark,
New Jersey 07101 (hereinafter referred to as "Artist").

### WITNESSETH:

1.   As used herein, the following terms shall have the
following meanings:

"MASTER" or "MASTER RECORDINGS" - An acetate, lacquer
or wax disc, or magnetic tape or wire or such other material
or device now or hereafter known, which is used or useful in
the recording of sound or sound and visual images, including
at Producer's option, visual reproductions (photographic or
otherwise) of the performance by Artist, from which phonograph
records and sight-and-sound recordings may be manufactured.

"LP" or "PHONOGRAPH RECORD ALBUM" - Shall mean one or
more 12-inch, 33-1/3 rpm records, or the equivalent thereof,
sold in a single package and shall include all sides, whether
or not released, which are recorded hereunder.

"PHONOGRAPH RECORDS" or "RECORDS" - Shall mean phonograph
records and record albums of any r.p.m. and any devices for
the reproduction of sound or sound and visual images (e.g.
"sight and sound" devices) on any material which may now or

hereafter be known, including, but not limited to, discs of wax, vinyl, or any other composition or pre-recorded tape, cartridges or wire.

"PRODUCER" - Shall, wherever context permits or requires herein, be deemed to mean, include and refer to the Producer named above, and all assignees, designees and licensees of the Producer named above.

"COMPOSITION" - Shall mean a musical composition or medley consisting of words and/or music, whether in the form of instrumental and/or vocal music, embodied on a master.

2.    Producer hereby engages Artist to render Artist's exclusive personal services as a recording artist as Producer may require, including, without limitation, reasonable advertising and promotional services in connection with the production of phonograph records, and Artist hereby accepts such engagement and agrees to render such services for Producer to the best of Artist's ability for an initial period of one (1) year commencing the date hereof and during all extensions thereof as hereinbelow set forth (the initial period and all extensions, if any, hereinafter referred to as the "term"). Each year of the term is hereinafter sometimes called a "contract year".

3.    During each contract year, Company shall request and Artist shall perform for the recording of one (1) LP phonograph record album. During each contract year Producer

-2-

shall have the right to request and upon such request Artist shall perform for the recording of one (1) additional LP phonograph record album during each contract year. Compositions to be recorded shall be mutually agreed upon by Producer and Artist and each recording shall be subject to Producer's approval as satisfactory for the manufacture and sale of phonograph records. The Masters to be recorded by Artist pursuant to this agreement shall not include masters recorded at a "live" or "in concert" performance unless Producer shall have consented in writing thereto. Upon Producer's request, Artist will record and re-record any composition until a master record which, in Producer's judgment, is commercially satisfactory shall have been obtained. All recordings shall be made upon reasonable notice to Artist at such studio and times as Producer may designate subject to Artist's reasonable availability. It is agreed that Artist shall give written notice to Producer of any date or dates that Artist shall be unavailable for recording or rerecording at least fifteen (15) days in advance of such unavailable date or dates.

In the event that, during any contract year Artist does not record the number of recordings requested by Producer pursuant to this Paragraph 3, Producer shall have the right, in addition to its other rights and remedies hereunder, to extend the expiration of the then current contract year and Artist's obligations hereunder until the expiration of four (4) months after the completion of Artist's said recording obligations. The expiration date of said four (4) month

period shall be deemed substituted for the expiration date of such contract year and the date of commencement of subsequent contract years shall be deemed extended accordingly.

4.   (a)   Artist warrants and represents that there is not in existence or effect any contract, arrangement or commitment for the future rendition of Artist's services in which Artist has granted to any person, firm or corporation any right or authorization to reproduce or permit or authorize others to reproduce Artist's voice or any performance by Artist for the purpose of manufacturing, selling, advertising or otherwise dealing with respect to phonograph records or allied products.

(b)   Artist further warrants and represents that neither Artist nor any other person, firm or corporation has any interest in, nor will own any recordings of Artist's performances which can or may be released in connection with the manufacture or sale of phonograph records during the term hereof except which are listed on Exhibit A annexed hereto and made a part hereof.

(c)   Artist covenants that during the term hereof and during any renewal term hereof, as same may be extended pursuant to Paragraphs 3, 7 and 9 hereof (and including any periods of suspension):

-4-

(i)  Artist will record exclusively for Producer or as Producer may designate.

(ii)  Artist will not perform for any party other than Producer in connection with, or for the purpose of, making phonograph records.

(iii)  Artist will not license or authorize any other person, firm or corporation to use Artist's name, likeness or any other identification in connection with any phonograph records made in violation of, or in any manner inconsistent with this Agreement, and Producer may, in its own name or in Artist's name, take all steps necessary at law or in equity to prevent any such use.

(iv)  Artist will not, without Producer's prior written consent, record hereunder any composition previously recorded by Artist, for himself or any other person, firm or corporation.

(v)  Artist will not, at any time, enter into any agreement, arrangement or commitment in violation of or inconsistent with this Agreement, or which may prevent or impair Producer's full enjoyment of the rights granted Producer hereunder.

(vi)  Artist will not, until five (5) years after the termination of this Agreement, or any extension or

-5-

renewal thereof, make, perform, distribute or sell or
authorize or permit any other party to make, distribute or
sell or otherwise deal with phonograph records (or devices
for similar purposes) embodying any performance by Artist of
a Composition recorded by Artist during the term of this
Agreement or any extension or renewal thereof. In the event
of a breach by Artist of the provisions of this sub-division
(vi), then in addition to any right or remedy which Producer
may have by law or otherwise, Artist shall automatically be
deemed to have waived all future royalties from sales of
records from such Artist's recordings which may accrue
hereunder after the date of such breach.

(d) Artist further covenants that during the term
of this Agreement or any extension thereof, Artist will not
enter into any arrangement, commitment or agreement for
Artist's rendition of his services in any manner including,
without limiting the generality of the foregoing, live
stage, motion picture and television performances, unless
Artist shall first, in connection with such arrangement,
commitment or agreement, obtain an express provision that
neither such performance nor any such recording thereof will
be used, directly or indirectly, for the purpose of making
phonograph records unless Artist shall have obtained the
express written consent of Producer which shall not be
unreasonably withheld. If, during the term of this Agreement,
or any extensions hereof, Artist performs in a motion picture
or stage performance any musical composition, the mechanical

-6-

"first license" of which has not yet been issued or granted
by the copyright proprietor thereof, Artist will use his
reasonable efforts to assist Producer in procuring from said
proprietor the mechanical "first license" upon terms favorable
to Producer or its designee.   Recordings embodying the
performance by Artist reproduced from soundtracks, original
cast recordings or similar reproductions with respect to
which Producer has acquired the rights to reproduce and sell
phonograph records made therefrom shall, at Producer's
option, be deemed to be performances recorded by Artist
hereunder.

      (e)   In the event that Producer shall enter into an
agreement with CBS Records, or any affiliate thereof, to supply
the services of Artist to such entity pursuant to this agreement,
CBS Records or its designee shall be deemed a third party
beneficiary in connection with this Paragraph 4.

    5.   (a)   All Masters recorded during the term of this
agreement and all derivatives manufactured therefrom, together
with the performances embodied therein shall from the inception
of their creation, be entirely and forever the property of Producer,
throughout the world free from any claims whatsoever by
Artist or any person, firm or corporation deriving any
rights or interests from Artist; and Producer or its designee
shall have the right to copyright the Masters in Producer's
or its designee's name as the owner and author thereof and to
secure any and all renewals of such copyright.   Without
limiting the generality of the foregoing, Producer shall

-7-

have the exclusive and perpetual right to all of the products
of Artist's services hereunder, including, but not limited
to, the exclusive right throughout the world:

        (i)   To manufacture, advertise, sell, lease,
license or otherwise use or dispose of in any or all fields
of use, and by any method now or hereafter known, throughout
the world, phonograph records and other reproductions
embodying the performances to be recorded hereunder, upon
such terms and conditions as Producer may elect, or at
Producer's discretion, to refrain therefrom.  Producer makes
no representation or warranty that any minimum number of
records will be manufactured or sold pursuant hereto by it
or any of its subsidiaries, affiliates, licensees, assignees
or designees.  "Single" records may be taken from an album
release, and an album may contain "single" releases.

        (ii)   To couple on recordings, performances by
Artist with performances by other artists and to require
Artist to perform jointly with other artists for the purpose
of producing records hereunder.  Notwithstanding the foregoing,
it is agreed that with respect to phonograph records embodying
Masters recorded by Artist pursuant to this agreement and
sold in the United States during the term of this agreement,
such master recordings shall not, without Artist's written
consent, which consent shall not be unreasonably withheld, be coupled
on "pop singles" with master recordings not embodying Artist's

-8-

performances nor, except in respect of promotional records
or recordings for use on or in means of transportation, will
more than one master recording made by the Artist hereunder
be so coupled on any other record without Artist's consent
which consent shall not be unreasonably withheld.  It is further
understood and agreed, that Artist shall not be required  to
perform hereunder together with any such other artist unless
the parties hereto shall have consented thereto, and no such
joint recording shall be counted toward the fulfillment of
the minimum recording obligation unless Producer shall specifically
consent thereto.

      (iii)  To use and publish and to permit others
to use and publish Artist's name, professional and actual,
photograph, likeness and biographical material in connection
with the sale and exploitation of phonograph records produced
hereunder; to write and publish and to permit others to
write and publish articles concerning Artist for advertising
and trade purposes in connection with the sale and exploitation
of phonograph records recorded hereunder; to use and permit
others to use as descriptive of Artist a phrase identifying
Artist with the label of the manufacturer or distributor of
records embodying Artist's performances hereunder.  Producer
shall not use or authorize any direct endorsement by Artist
without Artist's prior written consent which shall not be
unreasonably withheld.

(iv)   To release phonograph records of the Compositions performed by Artist and recorded hereunder under any names, trademarks, or labels which Producer or its licensee may, from time to time elect.   It is understood and agreed that with respect to the initial release of such records in the United States, such records shall be released on the Columbia Records or Epic Records label.

(v)   To publicly perform the phonograph records and to permit the public performance thereof by means of radio broadcasts, television, or by any other method now or hereafter known.

(vi)   The sole, exclusive and perpetual ownership of, and in the sound recordings made hereunder, including but not limited to, all master recordings, matrices, similar devices, and records and other reproductions of the foregoing, together with all right of copyright therein now or in the future granted and the performances and all other elements and "tracks" embodied in the foregoing and in such records or reproductions and the unlimited right to use said performances, elements and tracks separately or as a whole.

(b)   Producer's right, title, interest and privilege (including, without limitation, those enumerated in Paragraph

-10-

5(a) above), to, or in connection with, any of the results
or proceeds of Artist's services hereunder, shall survive
and remain unaffected by the expiration, suspension or
termination of this Agreement.

(c)  Artist represents that Artist is now a member
of, or will immediately become a member of AFTRA and/or AF
of M in accordance with the current applicable codes, or in
with agreements between Producer and/or any assignees or
designees of its rights hereunder, and will maintain such
membership in good standing during the term hereof and the
terms of any extensions hereof.  In the event that Producer
shall enter into an agreement with CBS Records or any affiliate
thereof, to supply the services of Artist to such entity pursuant
to this agreement, CBS Records or its designee shall be deemed
a third party beneficiary in connection with this subparagraph (c).

(d)  Artist acknowledges that Producer will have
the right to produce, distribute, promote, advertise and
sell as Producer sees fit, phonograph records recorded by
other recording artists, whether or not same may be competitive
with phonograph records recorded by Artist, without any
limitation whatsoever, and whether or not such records
recorded by other recording artists contain performances of

-11-

the same or similar or dissimilar musical compositions or
other material as that recorded by Artist.

   6.    Conditioned upon Artist's full and faithful per-
formance of all of the terms hereof, Producer will pay to
Artist in respect of recordings made hereunder, the following
total royalty upon the terms hereinafter set forth:

       (a)(i)  On net sales in the United States of
records in the form of discs and tape, embodying performances
recorded by Artist pursuant to this agreement during the
first contract year of the term, a royalty of seven (7%)
percent of the retail price of such records (less discounts).

       (ii) On net sales in the United States of
records in the form of discs and tape, embodying performances
recorded by Artist pursuant to this agreement during tne
second and third contract years of the term, a royalty of
eight (8%) percent of the retail list price of such records
(less discounts).

       (iii)  On net sales in the United States of
records in the form of discs and tape, embodying performances
recorded by Artist pursuant to this agreement during the
fourth and fifth contract years of the term, a royalty of
nine (9%) percent of the retail list price of such records (less

-12-

discounts).

     (b)   On net sales outside the United States of
records in the form of discs and tape, embodying performances
of Artist pursuant to this agreement, the royalty rate
payable hereunder shall be computed at one-half (1/2) of the
applicable royalty rate otherwise payable pursuant to this agree-
ment and shall be based upon the suggested retail list price of
such records in the country of manufacture, the United
States, England or the country of sale, as Producer shall
elect.   Such royalties shall be computed in the national
currency of the country to which the retail list price so
selected applies and shall be credited to Artist's royalty
account hereunder at the same rate of exchange as Producer
is paid.

     (c)   (i)   With respect to records sold on a
"budget label" or "special label" (as the term "special
label" is defined in Paragraph 11(g) of the agreement dated
August 15, 1975 between Producer and CBS Records), the
royalty rate shall be one-half (1/2) of the applicable
royalty rates provided for in Paragraphs 6(a) and 6(b)
above.

     (ii)   For sales of records which include
Masters subject hereto which are sold through the method
known as "key outlet marketing" by distribution through
retail fulfillment centers in conjunction with special
advertisements on radio or television, the method known as
direct mail or mail order, or by any combination of the

-13-

methods set forth above, Producer will set up a fund equal
to fifty (50%) percent of Producer's royalty receipts from
such sales and Artist will receive a percentage of such fund
equal to a fraction the numerator of which is seven (7) and
the denominator of which shall be seven (7) plus the royalty
rate paid to the individual producer of the Masters.  Notwith-
standing the foregoing, if the individual producer of the Masters
is Jerry Schoenbaum or Skip Drinkwater, Artist shall receive
a sum equal to fifty (50%) percent of Producer's receipts from
such sales in lieu of the aforesaid payment.

     (iii)  With respect to records sold through
record clubs, including, without limitation, the Columbia
Records Club, or other similar plans or devices, the royalty
rate shall be one-fourth (1/4) of the applicable royalty
rates provided for in Paragraphs 6(a) and 6(b) above.

     (d)  Company shall have the right to sell records
under any merchandising plans or terms it may deem desirable.
No royalties shall be payable on records furnished as free
or bonus records to members, applicants or other participants
in any record club or to purchasers through any direct
distribution method, on records distributed for promotional
purposes, records sold and/or distributed to radio stations
or for use on transportation facilities to promote or stimulate

the sale of phonograph records, on records shipped on a no-charge basis or on records sold for scrap or as "cut-outs" or at less than fifty (50%) percent of the wholesale price. The royalty rate on records sold for use as premiums or promotional merchandise shall be one-half (1/2) of the applicable royalty rates provided for in Paragraphs 6(a) or 6(b) above and shall be based upon the price received for such records.

(e)   Producer shall have the right to license recordings to other parties (a) for the phonograph record use on a flat fee basis and (b) for all other types of use on a flat fee or royalty basis.  Producer will set up a fund equal to fifty (50%) percent of Producer's royalty receipts from such sales and Artist will receive a percentage of such fund equal to a fraction the numerator of which is seven (7) and the denominator of which shall be seven (7) plus the royalty rate paid to the individual producer of the Masters. Notwithstanding the foregoing, if the individual producer of the Masters is Jerry Schoenbaum or Skip Drinkwater, Artist shall receive a sum equal to fifty (50%) percent of Producer's receipts from such sales in lieu of the aforesaid payment.

(f)   Notwithstanding any of the foregoing:

(i)   For purposes of computing royalties hereunder, any excise, sale or comparable or similar taxes

shall be excluded from the retail list price;

(ii)   For purposes of computing royalties, that portion of the price which is, or shall be, customarily allocated by Company's licensee for packaging (such as albums, jackets, boxes or other types of package or container) shall be excluded; and

(iii)   Royalties shall be computed and paid for upon one hundred (100%) percent of net sales (i.e., less returns) for which payment has been received by Producer. Notwithstanding the foregoing sentence, royalties with respect to record clubs shall be computed and paid for upon eighty-five (85%) percent of sales (less returns) for which payment has been received by Producer.

(g)   No royalties shall be payable to Artist on net sales until payment on such sales has been paid to and received by Producer.   In the event Producer shall not receive payment in United States dollars in the United States and Producer shall accept payment in foreign currency, Producer may deposit to Artist's credit (and at Artist's expense) in such foreign currency, in a depository selected by Artist, any payments so received as royalties applicable to this contract

which are then paya...e to Artist, and Producer shall notify Artist thereof promptly. Such payments shall be held in trust for Artist's sole benefit. Deposit as aforesaid shall fulfill Producer's obligations hereunder as to record sales to which such royalty payments are applicable.

(h) In the event the recordings made hereunder or any of them are coupled on a record with other recordings, the royalty hereunder shall be based upon that portion of the price which the number of sides made hereunder which are embodied on such records bears to the aggregate number of all recordings embodied on such record.

(i) If any Master is recorded hereunder by Artist jointly with another artist or musician to whom Producer is obliged to pay a royalty in respect of such side, (i) the royalty rate to be used in determining the royalties payable to Artist in respect of such master shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on such master, and (ii) in determining the portion of recording costs referred to in subparagraph (i) applicable to such Master which shall be charged against Artist's royalties, if and when earned, such proportion shall be computed by multiplying the aggregate amount of such recording costs by the same fraction used in

-17-

determining the royalties payable to Artist in respect of
such master.

It is specifically understood and agreed, however, that
Artist shall not be required to perform hereunder together
with any such other artist or artists unless Artist shall
have consented thereto, and that no such joint recording
shall be counted toward the fulfillment of Artist's minimum
recording obligation hereunder unless Producer shall speci-
fically consent, in writing, to count such joint recording
toward the fulfillment of such minimum recording obligation.

(j)   Accountings as to royalties payable hereunder
shall be made by Producer to Artist within thirty (30) days
after Company is accounted to by its licensee(s), together with
payment of accrued royalties, if any, earned by Artist
during the preceding half year less all advances and charges
under this contract.  Statements need not be rendered by
Producer with respect to those accounting periods during
which less than Ten ($10.00) Dollars accrued royalties are
due and owing to Artist.  Artist shall be deemed to have
consented to all royalty statements and all other accounts
rendered by Producer to Artist, and said statements and
other accounts shall be binding upon Artist and not subject
to any objection by Artist for any reason, unless specific
objection in writing, stating the basis thereof, is given by
Artist to Producer within eighteen (18) months from the date

-18-

rendered.   Artist shall have the right to appoint a certified
public accountant or attorney to inspect the books and
records of Producer, insofar as the same pertain to the
subject matter of this agreement, provided, however, that
such inspection shall take place only upon reasonable notice,
not more frequently than once in any calendar year during
which Artist receives a statement, and at the sole expense
of Artist.   It is understood that royalties attributable to
the sale of records recorded pursuant to this agreement
shall be subject to any reserves retained by Producer's
licensees and to any "free goods" policy maintained by such
licensee.

      (k)   As between Producer and Artist, Producer will
advance all costs of recording Artist in respect of recordings
made hereunder, including but not limited to the cost of the
following:   Studio rental, engineers, tapes, instrument hire
and cartage, the recording fees for artist other than Artist
(including vocalist, musicians and leaders), individual
producers, contractors, orchestrators, arrangers, copyists
and others whose performances are embodied in the master
recordings produced pursuant hereto, or whose producing
services are used in connection therewith, travel and per
diems for individuals involved in production of the Masters
payroll taxes and the payments required to be made to the

-19-

AFM Pension Welfare Fund, the AFTRA Pension and Welfare
Fund, and to any other pension or welfare funds, payment to
which may be necessary by reason of contractual obligations
of Producer or any assignee or licensee of Producer.

All recording costs advanced by Producer hereunder
shall be charged against and deducted from royalties payable
to Artist pursuant to this agreement if and when earned.   In
addition to any other rights Producer may have, if Artist
should fail to appear or be late in appearing at the time
and place designated by Producer for recording hereunder not
due to circumstances beyond Artist's control, Artist agrees
to pay to Producer all costs, expenses and charges incurred
or paid by Producer by reason thereof.

(l)   The manufacture and sale of any records made
hereunder may be discontinued when, in the sole discretion
of Producer, they are no longer commercially satisfactory or
their further sale and manufacture ceases to be profitable
or advisable.

(m)   If with respect to any contract year, Producer
fails to request Masters sufficient to constitute the minimum
recording obligation provided for in Paragraph 3 hereof

Producer shall have no liability to Artist whatsoever,
unless Artist has at all times been ready, willing and able
to record same, in which event Producer's only obligation to
Artist as to such recordings shall be to pay Artist at the
rate of union scale in full settlement of Company's obligation
in connection therewith in which event the term of this agreement
shall expire upon the expiration of such contract year; provided
that all payments at the rate of union scale shall be charged
against and recouped from royalties due Artist.

(n) Producer shall be in sole and exclusive
control of the distribution of phonograph records produced
hereunder and shall have the right to distribute, market and
exploit the same directly or through any subsidiary or
affiliated company, franchise holder or licensee or distributor
or any other person anywhere in the world,  Without waiving
any of its rights under the instant agreement, Producer will
have the right, in good faith, to cancel contracts entered
into between Producer and any third party involving the
distribution of phonograph records recorded hereunder, to
adjust or settle claims or disputes against it of any kind
and to give rebates, credits and allowances, and to accept
and/or request "returns" to such extent as it may deem
necessary, reasonable or proper in its sole discretion.
Phonograph records containing performances by Artist may be

-21-

sold separately or in groups with one or more other phonograph records.

7.    Artist acknowledges that Artist's performances and services hereunder, and the rights and privileges granted to Producer by Artist hereunder are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for in damages in an action at law, and that a breach by Artist of any of the provisions of this Agreement will cause Producer irreparable injury and damage, and Producer will be entitled to injunctive and other equitable relief to prevent Artist's breach of this agreement and Producer may, at its election, suspend this agreement and its obligation to make any payments hereunder (including accrued royalties) for any period of time during which Artist shall be in breach hereof, and at Producer's election, upon the termination of the suspension, to extend the term hereof for a period equal to the suspension period and the unexpired portion of the term prior to the suspension.  In such event, all subsequent option periods shall be postponed accordingly.  If royalty payments have been suspended, same shall not be resumed until Artist has

recorded the number of Masters which would have been recorded but for the suspension.  The foregoing shall be in addition to any other rights for damages or otherwise which Producer may have.

8.    In the event Artist should be convicted of a felony, Producer shall be entitled in addition to any other rights and remedies it may have hereunder, within thirty (30) days after such connection, to terminate the term of this agreement by notice in writing to Artist.  Upon such termination, Producer shall be relieved of any liability for the executory portions of this agreement.

9.    If the performance of Producer's or Artist's obligations under this agreement is delayed or becomes impossible or impracticable by reason of any act of God, fire, earthquake, strike, labor disturbance, civil commotion, acts of government, its agencies or officers, any order, war (whether or not officially declared) regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting Producer or the industry in which it is engaged, or delays in the delivery of materials and supplies or for any similar or dissimilar reason, Producer may suspend its obligations under this agreement for the duration of such delay, impossibility or impracticability,

-23-

as the case may be.  A number of days equal to the total of
all such days of suspension shall be added to the then
current term of this agreement.  In the event that any such
suspension hereunder exceeds six (6) months and shall affect
only Producer, Producer or Artist may, at its option, terminate
the term of this agreement by giving written notice to the
other party, in which event Producer shall have no further
obligation to Artist except for royalties and other amounts
due (if any) from the sale of records theretofore recorded
hereunder.

    10.    This agreement shall inure to the benefit of and
be binding upon the successors, permitted assigns, executors,
administrators, representatives, heirs and estates of
the parties hereto.  Producer may, at its election, assign
without Artist's consent this agreement or any or all of its
rights hereunder, or may license the same to to CBS, Inc.,
or any division, subsidiary or affiliate thereof, to any
other top recording company, to any company owned or controlled
by or under common control with Producer or to any trans-
feree or purchaser of substantially all of Producer's assets
of stock.  Any other assignment may only be made with Artist's
written consent which shall not be unreasonably withheld.
If such assignee or licensee of Producer shall undertake to
perform Producer's obligations hereunder, then, upon any
such assignment, the term "Producer" as used herein shall

mean and refer to such assignee or licensee and Producer shall be free of any obligation or duties to Artist hereunder. Artist may not assign this agreement without Producer's consent.

11. Artist will, upon Producer's request, appear on dates and at film studios or other locations to be designated by Producer upon reasonable notice to Artist, for the filming, taping or other permanent fixation of audiovisual reproductions of performances to be rendered by Artist hereunder. In connection therewith, Producer or Producer's designee will make a payment to Artist, as an advance against Artist's royalties hereunder for the services performed by Artist pursuant to the terms of this Paragraph 11, within a reasonable time after the completion thereof, at the rate of appropriate union scale.

During the term hereof, Artist will from time to time, at Producer's request and expense, whenever the same will not unreasonably interfere with other professional activities of Artist, appear for photography, poster and cover art etc.; and will perform other reasonable promotional services under direction of Producer or Producer's nominees.

12. This contract sets forth the entire agreement between Producer and Artist with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this Agreement or any provisions hereof

-25-

shall be binding upon either party unless confirmed by a written instrument signed by such party.   No waiver by a party of any provision of this contract or of any default hereunder shall affect such party's rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

13.   Notwithstanding the acceptance of the terms hereof by Artist, this contract shall not be deemed executed, and shall not become binding upon Producer until signed by Artist and countersigned by Producer's duly authorized officer.   The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof.   This contract shall be deemed to have been made in the State of New York, and its validity, construction and effect shall be governed by the internal laws of the State of New York, applicable to agreements wholly performed therein.

14.   All notices which Producer shall give to Artist hereunder and all statements, royalties and other payments which are due Artist hereunder, shall be addressed to Artist at Artist's address as first hereinabove set forth, until Artist shall give Producer written notice of a new address. All notices hereunder given to Producer shall be sent to Producer at its address first hereinabove set forth.   All notices except royalties, statements and payments shall be

served by registered or certified mail, return receipt requested.  The date of mailing of any such notice shall be deemed the date of the giving thereof.

15.   Artist hereby grants to Producer four (4) separate options, each to renew this contract for a one (1) year term, such renewal terms to run consecutively beginning at the expiration of the initial term, all upon the same terms and conditions applicable to the initial period.  Each option may be exercised by giving Artist written notice at least ten (10) days prior to the commencement of the renewal period for which the option is exercised.

The royalty rate applicable to any contract year of the term shall be the rate for masters recorded during such year and for Masters attributable to such period under Paragraph 16 hereof.

16.   If Artist shall record more than the minimum number of sides during the term hereof or during any renewal term, Producer may, at Producer's election, apply all or any part of the excess sides toward the fulfillment of the minimum number of sides specified for the next succeeding renewal period.

17.   Artist agrees that during the term hereof, Artist will continue Artist's activities in the field of public entertainment, and Artist will endeavor to enhance Artist's reputation.

-27-

18.    Artist warrants that he is over the age of twenty-
one (21) years.

19.    Artist acknowledges and agrees that the name
"MTUME" belongs exclusively to Producer for the purposes
hereinafter set forth and Producer shall have the right to
use it and authorize others to do so in connection with the
manufacture, advertising and sale of phonograph records
performed by Artist hereunder during the term of this Agreement
and thereafter with respect to records made during the term
hereof, and that Artist shall not, during the term of this
agreement, as a recording artist use or authorize the use of
the above name for said uses in connection with phonograph
recordings, by any person, firm or corporation, or refer to
Artist as a member of any group, without the express written
authorization of Producer which shall not be unreasonably
withheld.   In the event that Producer shall enter into an
agreement with CBS Records or its affiliate to furnish to
such entity Artist's services pursuant to this agreement,
CBS Records or its designee shall be deemed a third party
beneficiary with respect to this Paragraph 19.

20.    Artist agrees that in the event, in the opinion of
Artist, Producer has materially breached this agreement
Artist shall deliver to Producer by registered or certified
mail, return receipt requested, a written notice specifying
all such breache(s) and Producer shall have sixty (60) days

-28-

from the receipt by Producer of such written notice to cure
such breach(s). In the event that Producer shall enter into
an agreement with CBS Records or its affiliate to furnish to
such entity Artist's services pursuant to this agreement,
the aforesaid notice shall also be delivered by Artist by
registered or certified mail, return receipt requested, to
CBS Records or its designee, which at its election shall
have the right to cure such breach. Such alleged breach(s)
shall not be grounds for termination of this agreement until
the expiration of said sixty (60) day period and unless
during said sixty (60) day period Producer or CBS Records or
its designee has not substantially cured same.

21. Producer agrees to pay to Artist, the following
sums which shall be advances against, and deductible from,
any and all royalties and other sums which shall become
payable to Artist pursuant to this agreement:

(a) (i) Seven Thousand ($7,000) Dollars payable one-half (1/2)
upon execution of this agreement and the balance upon completion
of recording by Artist of technically satisfactory Masters constituting
the first LP phonograph record album to be recorded during the first
contract year of the term; (ii) Seven Thousand ($7,000) Dollars
payable upon completion of recording by Artist of technically
satisfactory Masters constituting each LP to be recorded during
the first contract year of the term subsequent to the first LP
phonograph recording of the first contract year.

(b) Eight Thousand Five Hundred ($8,500) Dollars payable
upon completion of recording by Artist of technically satisfactory
Masters constituting each LP phonograph record album to be recorded
during the second contract year of the term hereof.

-29-

(c)   Ten Thousand ($10,000) Dollars payable upon completion of recording by Artist of technically satisfactory Masters constituting each LP phonograph record album to be recorded during the third contract year of the term hereof.

(d)   Twelve Thousand Five Hundred ($12,500) Dollars payable upon completion of recording by Artist of technically satisfactory Masters constituting each LP phonograph record album to be recorded during the fourth contract year of the term hereof.

(e)   Fifteen Thousand ($15,000) Dollars payable upon completion of recording by Artist of technically satisfactory Masters constituting each LP phonograph record album to be recorded during the fifth contract year of the term hereof.

22.   (a)   Producer agrees provided Artist is not at any time in material breach of this agreement, or any part thereof, and provided Producer is in receipt of newly recorded, satisfactory Masters (edited and mixed) ready for Producer's or its designee's manufacture of phonograph records derived therefrom under Producer's or its designee's normal release schedule, together with all necessary licenses, consents, approvals and permissions, to cause the commercial release in the United States of one (1) LP phonograph record during each Contract Year within ninety (90) days after the date Producer shall have delivered or caused to be delivered such LP to Producer's designee for manufacture and distribution.

(b)   It is understood and agreed that if, during
any Contract Year, Producer shall have failed to cause
the release in the United States of the minimum number of
records provided for in subparagraph (a) above, Artist shall
have the right to notify Producer in writing of such failure
within fifteen (15) days after the end applicable 90-day
period referred to in subparagraph (a) above.  If Producer
does not, within one hundred twenty (120) days after
Producer receives such notice from Artist, cause the com-
mercial release in the United States of the applicable LP
not previously released, it is specifically understood and
agreed that Producer shall have no liability whatsoever to
Artist, and Artist's only remedy shall be to terminate this
agreement by written notice to Producer within fifteen (15)
days following the expiration of such one hundred twenty
(120) day period.

23.   (a)  Artist shall assist Producer in obtaining
mechanical licenses from the copyright proprietors of musical
compositions embodied upon the Masters delivered to Producer
hereunder, which licenses shall be in the general form
utilized by The Harry Fox Agency, Inc., or otherwise acceptable
to Producer.  The mechanical licenses for musical compositions
recorded pursuant to this agreement which are written or
composed, in whole or in part, by Artist, or owned or con-
trolled directly or indirectly, by Artist or by any person,

-31-

firm or corporation associated or affiliated with Artist ("Controlled Composition") shall be licensed to Producer at the rates set forth below and such mechanical licenses shall also provide that mechanical royalties shall only be payable on records for which royalties are payable pursuant to Paragraph 6 hereof:

(i)  Two (2¢) cents per Controlled Composition;

(ii) Notwithstanding the rate specified in division (i) above, it is specifically understood and agreed that the maximum copyright royalty rate which Producer will be required to pay in respect of an LP phonograph record album or its equivalent ("LP") made hereunder, regardless of the number of Compositions contained thereon, shall be twenty (20¢) cents.  Without limiting Producer's rights pursuant to the foregoing, sentence, in the event that an LP contains other Compositions in addition to Controlled Compositions and the aggregate copyright royalty rate for said LP shall exceed twenty (20¢) cents, it is specifically understood and agreed that the aggregate rate for the Controlled Compositions contained thereon shall be reduced by the aforesaid excess over twenty (20¢) cents.

(b)  Notwithstanding anything to the contrary contained in sub-paragraph (a) above, it is specifically understood and agreed that in the event legislation increasing the statutory copyright royalty rate in the United States shall become effective and, as a result of such legislation, Producer shall pay any artist then currently under contract to Producer for such artist's compositions recorded by him

for Producer a rate in excess of two (2¢) cents per com-
position, Producer shall pay Artist in respect of Controlled
Compositions thereafter recorded by Producer such higher
rate, but in no event more than the new statutory rate for
each Controlled Composition.  It is further understood and
agreed that in the event the applicable copyright royalty
rate in respect of Controlled Compositions licensed by
Producer hereunder is increased pursuant to the provisions
of this sub-paragraph (b), Producer shall similarly increase
the aggregate copyright royalty rate payable pursuant to the
provisions of sub-paragraphs (a)(ii) hereof on a propor-
tionate basis.   This provision shall apply only to Controlled
Compositions recorded by Producer after the effective date
of any such legislation.

24.    Artist agrees to and does hereby indemnify, save
and hold Producer harmless of and from any and all loss and
damage (including reasonable attorneys' fees) arising out of
or connected with any claim by any one or more third parties
which is inconsistent with any of the warranties, represen-
tations, and/or agreements made by Artist herein, and agrees
to reimburse Producer on demand for any payment made by it at
any time with respect to any liability or claim to which the
foregoing indemnity applies.  Pending the determination of
any claim, Company may withhold all sums consistent with
any such claim due Artist pursuant to the provisions of this

agreement.   The foregoing indemnity shall not apply to
any claimed settled without Artist's consent, which consent
shall not be unreasonably withheld.

25.    Wherever in this agreement Artist's approval or
consent is required, Producer may require Artist to formally
give or withhold such approval or consent by giving Artist
written notice requesting the same and by furnishing Artist
with the information or material in respect of which such
approval or consent is sought.  Artist shall give Producer
written notice of approval or disapproval within three (3)
business days after such notice is received by Artist.
In the event of disapproval or no consent, the reasons therefor
shall be stated.  Failure to give such notice to Producer
aforesaid shall be deemed to be consent or approval.

26.   Artist hereby consents and submits to the juris-
diction and venue of the supreme court of the State of New
York, New York County, and the United States District Court
for the Southern District of New York for the adjudication
of any dispute between Artist and Producer arising out of or
relating to this Agreement or the alleged breach thereof,
and Artist further agrees that any process of such Courts
issued in connection with the adjudication of any such
dispute may be served upon Artist by certified or registered
mail and that such service by mail shall be of the same
force and effect as if such process had been personally
served upon Artist within New York State.

-34-

27.   Producer and Artist shall mutually select the
individual producer of the masters embodying Artist's per-
formances subject hereto.  In the event Producer and Artist
cannot mutually agree on the selection of an individual
producer within thirty (30) days from the commencement of
this agreement or if Producer or Artist wishes to select a
different producer, and if Producer and Artist cannot
mutually agree on the selection of a substitute producer
within thirty (30) days from the date Producer or Artist
notifies the other of its desire to select a new individual
producer, then the then current contract year shall be auto-
matically suspended until such time as a producer is selected,
and such contract year shall be extended by the number of
days of such suspension and the dates for the exercise of
subsequent options and the commencement of subsequent contract
years shall be extended accordingly.

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be executed the day and year first above written.


ZEMBU PRODUCTIONS, INC.

By _____


_____
JAMES MTUME professionally
known as MTUME

EXHIBIT  "A"

"REBIRTH CYCLE"                    Gordon Records

"LAND OF THE BLACKS"              Strata-East Records