# Exhibit B

AGREEMENT made as of October 21, 1983 between Ifland Corp.
("you"), c/o Grubman, Indursky & Schindler, P.C., 575 Madison
Avenue, New York, New York 10022, and CBS Records ("CBS"), a
Division of CBS Inc., 51 West 52nd Street, New York, New York
10019.

The letter agreement between you and CBS dated as of October
21, 1983 (CRU 83-649A) is hereby superseded by this agreement.

1.   TERM

    1.01.    The term of this agreement will begin on
October 21, 1983 and will continue for a first Contract Period
ending eight months after whichever of the following dates is
the earlier:

            (a)  The date of completion of the lacquer,
    copper, or equivalent masters to be used in manufacturing
    the disc Phonograph Record units to be derived from the
    last Master Recordings made in fulfillment of your
    Recording Commitment for that Contract Period under
    paragraph 3.01 below; or

            (b)  The date 30 days after you give CBS notice
    that you have completed the Delivery of those Master
    Recordings.

    1.02.    You grant CBS three separate options to extend
that term for additional Contract Periods ("Option Periods") on
the same terms and conditions, except as provided in paragraph
1.03.  Except as expressly provided otherwise in this
agreement, CBS may exercise each of those options by sending
you a notice at any time at least thirty (30) days before the
expiration date of the Contract Period which is then in effect
(the "current Contract Period").  If CBS exercises such an
option, the Option Period concerned will begin immediately
after the end of the current Contract Period.  CBS may exercise
only one of the options described in this paragraph during any
Contract Period.

    1.03.    If CBS exercises its option for a third Option
Period hereunder:  (a) the term of this agreement will end on
the date when you complete Delivery of the last Master
Recordings made in fulfillment of your Recording Commitment for
the third Option Period; and (b) you shall not authorize or
permit the distribution or sale by any Person other than CBS of
any Record embodying performances of the Artist until the
earlier of the following dates:  (i) the date eight (8) months
after the end of the term hereof, or (ii) the date six (6)
months after the release of the last Master Recordings made in
fulfillment of your Recording Commitment for the third Option
Period..

ID:  3856e    DFW    (CRU 83-761.2(1))    pgf    4/12/84

2.   SERVICES

2.01.      During the term of this agreement you will
furnish the services of James Mtume, p/k/a "MTUME" (the
"Artist") to perform for the purpose of making Master
Recordings for CBS, you will cause those Recordings to be
produced, and you will Deliver the Recordings to CBS, as
provided in this agreement.

2.01.1.     You shall use your best efforts to arrange for
Tawatha Agee to perform as a featured vocalist on at least two
Compositions performed on each of the Albums made hereunder.

2.02.      (a)  Your obligations will include furnishing the
services of the producers of those Master Recordings, and you
will be solely responsible for engaging and paying them.
(Producers who you engage are referred to in this agreement by
the capitalized term "Producers.")

(b)  If CBS, instead, engages producers for any
of those Master Recordings, or if the producers of any such
Recordings are regularly employed on CBS' staff or render their
services under contract with CBS, the following terms will
apply:

(1)  Your royalty account and the production
budget for the recording project concerned will be charged
with a Recording Cost item of $15,000 (or $1,500 per Side
for a project for the recording of less than an Album).  If
CBS is obligated to pay those producers a higher fixed
amount attributable to that project, the charge under this
section will be that amount instead.

(2)  Your royalty on those Recordings under
Article 9 will be reduced by the amount of a royalty of
7.06% on Albums under subsection 9.01(a)(1)(i), adjusted in
proportion to the other royalty rates and royalty
adjustments provided for in the other provisions of
Articles 9 and 10.  (If a higher royalty is payable to the
producers, the reduction under this section will be the
amount of that royalty instead.)

(This subparagraph (b) will not apply unless you have consented
to the engagement of the producer concerned, or the assignment
of the staff or contract producer concerned to the recording
project.)

3.   RECORDING COMMITMENT

3.01.      With respect to each Contract Period you will
cause the Artist to perform for the recording of Master

ID:  3856e                        -2-                    CRU 83-761.2(1)

Recordings sufficient to constitute two Albums, cause those Master Recordings to be produced, and Deliver them to CBS.

3.02.      You will Deliver the first Album hereunder to CBS on or before April 30, 1984. You will Deliver each subsequent Album (if any) not earlier than six months after Delivery of the Album Delivered immediately prior to the Album concerned, and not later than twelve months after such Delivery.   It is hereby acknowledged that the delivery schedule provided for in this paragraph may not be appropriate due to the fact that the Artist will be performing as a producer for the purpose of making Records embodying performances of Tawatha Agee and other recording artists under contract to CBS.   Thus if such performing causes such schedule to be inappropriate, the parties shall discuss in good faith changes in such schedule to take into account such performing.

3.03.      Each Album will consist of Master Recordings made in the course of that Album recording project.

4.   RECORDING PROCEDURE

4.01.      You will follow the procedure set forth below in connection with Master Recordings made hereunder:

(a)  Except as expressly noted otherwise in this agreement, prior to the commencement of recording in each instance you shall obtain the approval of CBS of each of the following, in order, before proceeding further:

(1)  Selection of Producer.   The Artist is deemed approved as a Producer.

(2)  (i)  Selection of material, including the number of compositions to be recorded, but only as specified in subsection (ii) below.   You shall advise CBS of the content of all medleys before recording.

(ii)  CBS will not be deemed unreasonable in disapproving any material which CBS deems patently offensive or which, in the judgment of its attorneys, might subject it to unfavorable regulatory action, violate any law, violate the rights of any Person, or subject it to liability for any reason.   CBS will not be deemed to be unreasonable in rejecting any request to record an Album consisting of more than one twelve-inch 33 1/3 rpm Record.

(3)  Selection of studios where recording is to take place if the studio concerned is not a first-class recording studio, if its use would be inconsistent with any of CBS' union agreements, or if CBS anticipates that its use would cause labor difficulties for other reasons.   For purposes of the

preceding sentence, you shall inform CBS of all studios where recording is to take place prior to commencement of recording.  CBS' facilities and the services of its engineers will be used to the extent required by CBS' union agreements.

(4)  A proposed budget (which you will submit to CBS sufficiently in advance of the planned commencement of recording to give CBS a reasonable time to review it at least 14 days before the planned commencement of recording).  A budget not exceeding the applicable Recording Fund fixed in paragraph 6.02 will be deemed approved.

(b)  You shall notify the appropriate Local of the American Federation of Musicians in advance of each recording session.

(c)  As and when required by CBS, you shall allow CBS' representatives to attend any or all recording sessions hereunder.

(d)  You shall timely supply CBS with all of the information it needs in order:  (1) to make payments due in connection with such Recordings; (2) to comply with any other obligations CBS may have in connection with the making of such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings.  Without limiting the generality of clause (2) of the preceding sentence, you shall furnish CBS with all information it requires to comply with its obligations under its union agreements, including, without limitation, the following:

(1)  If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians), the dates and places of the prior sessions at which such existing tracks were made, and the AFM Phonograph Recording Contract (Form "B") number(s) covering such sessions.

(2)  Each change of title of any composition listed in an AFM Phonograph Recording Contract (Form "B").

(3)  A listing of all the musical selections contained in Recordings Delivered to CBS hereunder.

(e)  You shall Deliver to CBS fully mixed, edited, and equalized Master Recordings, technically

ID:  3856e                         -4-                    CRU 83-761-2(1)

satisfactory (as defined in paragraph 14.20) to CBS for its
manufacture and sale of Phonograph Records, and all
original and duplicate Master Recordings of the material
recorded, together with all necessary licenses and
appropriate permissions.  Each Master Recording will be
clearly marked to identify the Artist as the recording
artist, and to show the title(s) of the composition(s) and
recording date(s).

4.02.     No "live" Recording or Recording not made in full
compliance with the provisions of this agreement will apply in
fulfillment of your Recording Commitment, nor will CBS be
required to make any payment in connection with any such
Recording, unless CBS so agrees in writing or releases the
Recording on Records for sale to the public.  No Composition
previously recorded by the Artist will be recorded under this
agreement.  No Joint Recording will apply in fulfillment of
your Recording Commitment, nor will CBS be required to make any
payments in connection with any such Joint Recording other than
royalties due you hereunder, even if such Joint Recording is
released by CBS.  No Recordings shall be made by unauthorized
dubbing.

4.03.     There is no paragraph 4.03.

4.04.     The Artist will not be required to perform
together with any other royalty artist without the Artist's
consent, which he may withhold in his sole discretion.  CBS
shall not be deemed to be unreasonable in rejecting any request
for the Artist to record with another royalty artist.  The
Artist and CBS both hereby consent to the performance of the
Artist together with Tawatha Agee as described in paragraph
2.01.1.

4.05.     Each Album made hereunder will embody
performances of at least three Compositions written solely by
the Artist.

5.  RECOUPABLE COSTS

5.01.     (This paragraph will not apply if paragraph 5.04
does, except as provided in paragraph 5.04.)  CBS will pay all
union scale payments required to be made to Artist in
connection with Recordings made hereunder, all costs of
instrumental, vocal and other personnel specifically approved
by CBS for the recording of such Master Recordings, and all
other amounts required to be paid by CBS pursuant to any
applicable law or any collective bargaining agreement between
CBS and any union representing Persons who render services in
connection with such Master Recordings.

ID:  3856e                    -5-                    CRU 83-761.2(1)

5.02.      (This paragraph will not apply if paragraph 5.04 does, except as provided in paragraph 5.04.)  All amounts described in paragraph 5.01 above plus all other amounts representing direct expenses paid by CBS, or incurred in connection with the recording of Master Recordings hereunder (including, without limitation, travel, rehearsal, and equipment rental expenses, advances to producers, and all studio and engineering charges, in connection with CBS' facilities and personnel or otherwise) are herein sometimes called "Recording Costs" and shall constitute Advances.  All costs incurred by CBS in connection with the production of motion pictures made for use in promoting sales of Records made under this agreement, will constitute Advances also.  The costs of copper and other masters equivalent to lacquer masters will be chargeable as Recording Costs, subject to the next sentence.  Recording Costs do not include the cost of preparation of the final lacquer, copper, or other equivalent master actually used by CBS for the production of the metal parts used to manufacture Records.  The costs of metal parts other than those masters described in the second preceding sentence, and payments to the AFM Special Payments Fund and the Music Performance Trust Fund based upon record sales (so-called "per-record royalties"), shall not constitute Advances.  Any Recording Costs in excess of the Recording Fund fixed in paragraph 6.03, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly; if paid by CBS, they will constitute Advances and, if CBS so requires, will be reimbursed by you.

5.03.      (This paragraph will not apply if paragraph 5.04 does, except as provided in paragraph 5.04.)  The portion of the Advances applicable to any Joint Recording which are chargeable against your royalties under this Article 5 will be computed by multiplying the aggregate amount of those Advances by the same fraction used in determining the royalties payable to you in respect of that Joint Recording.

5.04.      (a)  You will have the option to produce the Master Recordings constituting any Album in accordance with this paragraph 5.04 instead of paragraphs 5.01, 5.02 and 5.03, and if you exercise such option, paragraph 6.02.1 will apply instead of paragraph 6.02.  Such option shall be deemed exercised unless you notify CBS otherwise in writing.  (The provisions of paragraph 5.02 regarding Special Packaging Costs and motion picture production costs will continue to apply in all events.)

(b)  Such option shall not be deemed exercised and you will not be entitled to exercise such option unless you have furnished CBS with documentation, satisfactory to it, that:  (1) you are then a party to all AFM and AFTRA

collective bargaining agreements covering the production of those Recordings and any other applicable collective bargaining agreements; (2)  all unions concerned and the owners of the recording studios to be used have agreed not to look to CBS for payment of any scale compensation or other obligations arising in connection with the making or use of those Recordings (except the "per-record royalties" referred to in paragraph 5.02); and (3)  the owners of the recording studios have agreed to comply with CBS' instructions relating to the Recordings.

(c)  You will comply with all union rules, regulations and agreements applicable to the Recordings.

(d)  You warrant that the following shall be readily available to CBS:  all licenses required under copyright for the recording of the musical compositions on the Master Recordings to be made hereunder and any other copyrighted material reproduced in such Recordings on the terms prescribed in Article 12.  Before the Delivery of the Recordings to CBS:  (1)  you will make all of the payments referred to in paragraph 5.01; (2)  you will make all payments (except Mechanical Royalties) required under the licenses described in the first sentence of this subparagraph (d); (3) you will pay or furnish CBS with waivers of all other Recording Costs and other payments (except those "per-record royalties") to which any Person may become entitled in connection with those Rec rdings or their use in the manufacture and sale of Phonograph Records; and (4)  you will furnish CBS with the name of each vocalist who may be a "covered artist" under Appendix A to the AFTRA 1977-1980 National Code of Fair Practice for Phonograph Recordings (or any applicable successor agreement) and all required AFTRA forms, duly completed and executed. Your failure to notify CBS of those vocalists will constitute your warranty and representation that no such "covered artist" rendered services in connection with the Recordings.

(e)  You will furnish CBS with all information and all further instruments and documents which CBS may reasonably require in connection with the Recordings or to implement this paragraph.  If any claim is asserted against CBS for payment of any obligation required to be discharged by you in this paragraph, CBS will give you notice of such claim. Subject to the following sentence, if you do not satisfy or otherwise discharge or satisfactorily explain to CBS the invalidity of such claim (as determined by CBS in its sole discretion) within ten (10) days after such notice, CBS will have the right to make the payment and you will reimburse CBS for it.  If any material right of CBS would be jeopardized by according you such ten-day period (as determined by CBS in its sole discretion), CBS may immediately make the payment concerned and you will reimburse CBS for it.

6.   ADDITIONAL ADVANCES

6.01.   All monies paid to you during the term of this agreement, other than royalties paid pursuant to Articles 9 and 12 hereof, and except as expressly provided otherwise herein, shall constitute Advances unless otherwise expressly agreed in writing by an authorized officer of CBS.  All monies paid to third Parties on your behalf or to the Artist or on the Artist's behalf, other than royalties paid pursuant to Articles 9 and 12 hereof and except as specifically provided otherwise herein, shall constitute Advances to you only to the extent that (i) you have given CBS authorization (whether written or otherwise) to make such payments, or (ii) such payments should have been made by you pursuant to this agreement but were not, and are made by CBS to satisfy obligations incurred by you or Artist in connection with the subject matter of this agreement.

6.01.1.   Promptly after execution hereof, CBS shall pay you an Advance equal to $210,000.  It is hereby acknowledged that, in addition to such Advance payable on execution hereof, you have previously been paid an Advance of $15,000 and the Advance described in subparagraph 6.02.1(b).  (See paragraph 12.06 regarding the payment of certain mechanical royalties.)

6.02.   (a)   (This paragraph shall not apply if paragraph 6.02.1 applies.)  Promptly after your Delivery to CBS of the Master Recordings constituting an Album recorded pursuant to your Recording Commitment, CBS will pay you an Advance in the amount by which the applicable sum indicated in subparagraph 6.02(b) ("Recording Fund") exceeds the Recording Costs for the Album.

(b)   The amount of the Recording Fund for each Album Delivered hereunder will be two-thirds (2/3) of the amount of the royalties credited to your account on Net Sales Through Normal Retail Channels in the United States of the "Preceding Album" (defined below), as shown by CBS' trial balance, net of reserves against anticipated returns or credits, as of the end of the last month ending prior to the last date on which Delivery of the Album concerned is permitted under Article 3.  If CBS agrees to postpone the last date on which Delivery of the Album concerned is permitted under Article 3, such postponement will not apply for purposes of the immediately preceding sentence.  In the case of the first Album Delivered hereunder, the "Preceding Album" means the Album entitled "Juicy Fruit."  In the case of all other Albums, the "Preceding Album" means the Album made under this agreement released most recently before Delivery of the Album concerned. The Recording Funds under this subparagraph 6.02(b) shall be subject to the following minimums and maximums:

ID:  3856e                           -8-                    CRU 83-761.2(1)

(1)  For Albums Delivered during the initial Contract Period or first Option Period:  $250,000 minimum and $500,000 maximum; and

(2)  For Albums Delivered during the second or third Option Period:  $300,000 minimum and $600,000 maximum.

If any Album recorded hereunder is not Delivered within 90 days after the time prescribed in Article 3, the Recording Fund for that Album will be reduced by 7.5% for each month or fraction thereof that such failure to Deliver continues after such 90-day period, but shall not be reduced below the following amounts:

(A)  For Albums Delivered during the initial Contract Period or first Option Period: $150,000; and

(B)  For Albums Delivered during the second or third Option Period:  $225,000.

6.02.1.    (a)  Paragraph 6.02 will not apply to any Album recorded under paragraph 5.04.  Instead, with respect to each such Album, promptly after commencement of recording of such Album, CBS will pay you an Advance ("Commencement Payment") equal to 1/2 of the minimum applicable to the Recording Fund for such Album, and promptly after Delivery of such Album to CBS, CBS shall pay you an Advance equal to the excess of the Recording Fund for such Album over the Commencement Payment for such Album.

(b)  As a result of your deemed exercise, under subparagraph 5.04(a), of your option under paragraph 5.04 with respect to the first Album to be recorded hereunder during the initial Contract Period, CBS shall, pursuant to subparagraph 6.02.1(a), pay you a Commencement Payment with respect to such Album equal to $125,000.  It is acknowledged in paragraph 6.01.1 that CBS has already paid you such Commencement Payment.

6.03.    If CBS releases any Album consisting substantially of Master Recordings made under this agreement or the agreement between you and Zembu Productions, Inc. dated June 24, 1977, as modified, and previously released in different Album combinations, such as a "Greatest Hits" or "Best Of" Album, CBS shall pay you an Advance equal to the excess of $150,000 over the amount of your "unearned royalty" account as of the date of such release.  Your "unearned royalty" account shall mean the amount by which Advances and other offsets against your royalties exceed royalties credited to your account, as shown by CBS' trial

ID:  3856e                    -9-                    CRU 83-761.2(1)

balance, net of reserves against anticipated returns or credits, as of the end of the last month ending prior to the date of such release.

## 7.  RIGHTS IN RECORDINGS

7.01.     Each Master Recording made under this agreement or during its term, from the Inception of Recording, will be considered a "work made for hire" for CBS; if any such Master Recording is determined not to be a "work made for hire" it will be deemed transferred to CBS by this agreement, together with all rights in it.  All Master Recordings made under this agreement or during its term, from the Inception of Recording, and all Matrices and Phonograph Records manufactured from them, together with the performances embodied on them, shall be the sole property of CBS, free from any claims by you or any other Person; and CBS shall have the exclusive right to copyright those Master Recordings in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the world.  You will execute and deliver to CBS such instruments of transfer and other documents regarding the rights of CBS in the Master Recordings subject to this agreement as CBS may reasonably request to carry out the purposes of this agreement, and CBS may sign such documents in your name or the name of the Artist and make appropriate disposition of them.  CBS will give you ten (10) days' notice before signing any document in your name or the name of the Artist.  CBS may dispense with that waiting period when necessary, in CBS' judgment, to protect or enforce its rights, but CBS will notify you in each instance when it has done so. CBS will not be required to notify you before signing short form assignments of rights granted in this agreement for recordation in the Copyright Office.

7.02.     Without limiting the generality of the foregoing, CBS and any Person authorized by CBS shall have the unlimited and exclusive rights (subject to the terms and conditions of this agreement) to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made under this agreement or during its term, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing, throughout the world.

## 8.  MARKETING

8.01.     CBS and any Licensee of CBS each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist and Producer(s) and all other persons performing services in connection with Master Recordings made under this agreement

(including, without limitation, all professional, group, and other assumed or fictitious names used by them), and biographical material concerning them, as news or information, for the purposes of trade, or for advertising purposes. Those authorized uses do not include direct endorsements or any advertising which is not related to the Artist, CBS or the Master Recordings made hereunder. CBS will make available for your inspection and approval at its offices in New York City any portrait, picture or likeness of the Artist or biographical material concerning the Artist (collectively "ID Materials") that it proposes to use pursuant to this paragraph 8.01 or otherwise. If, within fifteen (15) days after CBS has notified you that ID Materials are available for your inspection, you do not submit substitute ID Materials to CBS, satisfactory to CBS in its sole discretion, you shall be deemed to have approved the ID Materials prepared by CBS. During the term of this agreement neither you nor Artist shall authorize any Party other than CBS to use the name or likeness of Artist (or any professional, group, or other assumed or fictitious name used by Artist) in connection with the advertising or sale of:

> (a)  Phonograph Records; or

> (b)  Blank recording tape or tape recording equipment.

8.01.1.  Neither party may use, in connection with the marketing of merchandise other than Records, the artwork used on the covers of Albums made hereunder, unless the other party consents.

8.02.  At CBS' expense, you and the Artist will cooperate with CBS, as it reasonably requests and subject to prior, reasonable commitments of you and the Artist, in making photographs and preparing other materials for use in promoting and publicizing the Artist and the Recordings made under this agreement.

8.03.  During the term of this agreement, in respect of Records manufactured for sale in the United States, CBS will not, without your consent and notwithstanding anything in this agreement:

> (a) (1) couple Master Recordings made under this agreement with recordings not embodying your performances on Singles; or (2) so couple more than two such Master Recordings on any other Record, except promotional Records and programs for use on public transportation carriers and facilities.

(b)   Use Master Recordings made under this agreement on "Premium Records." (A "Premium Record" is a Record, produced for use in promoting the sale of merchandise other than Phonograph Records, which bears the name of the sponsor for whom the Record is produced.)

(c)   Sell Phonograph Records derived from any Master Recording made under this agreement as "cut-outs" within two years after the initial release of the Master Recording concerned on Phonograph Records in the United States.

(d)   Release any Album consisting of Master Recordings made under this agreement as a Budget Record within fifteen months after its initial release in the United States.

(e)   Initially release any Album consisting of Master Recordings made pursuant to your Recording Commitment under any Record label other than the Epic label, or other label then used by CBS for Recordings of performances by CBS' best selling pop artists then under exclusive term contract to CBS.

8.03.1.   CBS will not, for television broadcast purposes, combine any Pictures (as defined in paragraph 9.07) in the form of a feature-length video program, but CBS will not be responsible for the order in which such Pictures are shown by television stations.

8.03.2.   CBS shall consult with you regarding the selection of Sides to be used on any Album described in paragraph 6.03, but the final selection of such Sides shall be in CBS' sole discretion.

8.03.3.   CBS will not, without your consent and notwithstanding anything to the contrary in this agreement:

(a)   Exploit so-called 'outtakes' or other preliminary or alternate versions of sound recordings which are created during the production of Master Recordings made hereunder.

(b)   Edit or remix any Master Recordings made hereunder and produced by the Artist (but CBS may resequence such Recordings for the purpose of equalizing the running time of tracks on non-disc Records).

8.03.4.   CBS may not exploit Pictures (as defined in paragraph 9.07) by way of Videoshows (as defined below), except in the case of the first so-called video featuring a Side included in the first Album made hereunder. "Videoshows" mean

so-called videocassettes and videodiscs and any other audiovisual reproductions, now or hereafter known or developed, that enable so-called videos to be perceived when such reproductions are used in combination with or as part of an electronic, mechanical or other apparatus, and that are intended primarily for home use or private viewing.

8.04.    In preparation for the initial release in the United States during the term of this agreement of each Album comprised in the Recording Commitment, you shall have the right to produce and deliver to CBS the Album packaging layout and the pictures or art to be used in connection with the Album, but only on the following conditions:

(a)   Your plans for the proposed artwork will be discussed with CBS' Records' Vice President, Packaging Art & Design or his designee before it is produced and a non-recoupable budget will be assigned for artwork costs which will not exceed $5,000.

(b)   You will produce the artwork in accordance with the plans approved by CBS and will deliver "camera ready" artwork to CBS, together with all licenses and consents required in connection with it, not later than the following date:  the date sixty days before the scheduled release date of the Album if CBS informs you of such release date prior to such sixty days and prior to Delivery of the Album, or if CBS does not so inform you, then the date on which you Deliver the Album.  If any of that material has not been delivered to CBS within that time, CBS will have the right to prepare and use its own artwork without further consultation with you, and CBS shall not be obligated to make any payments to you or any other person to whom you have incurred any obligation in connection with any artwork produced for the Album concerned.

(c)   You will deliver to CBS, together with the artwork, an itemized statement of your actual costs in connection with it.  CBS will reimburse you after its acceptance of the artwork in the amount of those costs, up to but not in excess of the approved budget.  If CBS in its sole discretion shall elect to reimburse you for costs in excess of the approved budget, such excess shall constitute an Advance.

(d)   CBS shall have the right to reject any artwork which is not XXXXXXXXXXXX satisfactory in CBS' reasonable judgment.  CBS will not be deemed unreasonable in rejecting any artwork which CBS anticipates would require it to incur:  (1) engraving costs of more than $1,600; (2) disc packaging manufacturing costs (including



ID:  3856e                          -13-                    CRU 83-761.2(1)

sleeves and all other packaging elements) for Albums manufactured for distribution in the United States or Canada in excess of 20¢ per Album unit; or (3)  disc packaging manufacturing costs for Albums manufactured for distribution elsewhere in excess of the standard manufacturing costs incurred by CBS or the CBS Licensee concerned for disc Albums manufactured in the same territory as the Album units concerned.  CBS will not be deemed unreasonable in rejecting any artwork which may be patently offensive, violate any law, infringe the rights of any Person, or subject CBS to liability for any reason.  If CBS accepts the artwork, all engraving and manufacturing costs in excess of the amounts specified above will be reimbursed by you on CBS' request; all such excess amounts not reimbursed will constitute Advances and may be recouped by CBS from any payments becoming due to you or the Artist.

(e)  All artwork and related material delivered hereunder and all rights in it, including copyright and the right to secure copyright, will be CBS' property throughout the world and in perpetuity.

(f)  All matters relating to CBS' trademarks, legal obligations, or other requirements shall be determined in CBS' sole discretion.

(g)  You will act as an independent contractor in all arrangements you make with others in connection with the production of the artwork; you will not purport to make any such arrangements as CBS' agent or otherwise on behalf of CBS.

(h)  Any premium charges that are incurred by CBS to meet the release schedule of the Album because of late delivery of the artwork or costs incurred by CBS to correct or otherwise modify the artwork shall constitute Advances.

8.04.1.   If you choose not to exercise your rights under paragraph 8.04 with respect to any Album made hereunder, then in preparation for the initial release in the United States during the term of this agreement of such Album, the following procedure will be followed:

(a)  CBS will undertake to consult with the Artist regarding the proposed Album cover layout and the picture or art to be used on the cover.  The proposed Album cover will be made available to the Artist at CBS' offices for review and comment.  Unless otherwise provided in this paragraph 8.04.1, CBS will make such changes in the artwork as you or the Artist reasonably request.

(b)   CBS shall not be required to make any changes which would delay the release of the Album beyond the scheduled date or which would require CBS to incur costs in excess of the limits referred to in paragraph 14.25.  Any premium charges incurred to meet the release schedule because of delays in approvals by you or the Artist will constitute Advances.

(c)   All rights in any artwork or related material furnished by you or at your request, including copyright and the right to secure copyright, will be CBS' property throughout the world and in perpetuity.

(d)   All matters relating to CBS' trademarks or to notices or disclosures deemed advisable by CBS' attorneys, and any matter other than the album cover layout and the picture or art to be used on the cover, will be determined in CBS' sole discretion.  CBS will not be deemed unreasonable in rejecting any requested change upon the advice of is attorneys.

8.05.     Provided you have fulfilled all your obligations under this agreement:

(a)   CBS will release each Album recorded in fulfillment of your Recording Commitment in the United States within three months after the date of completion of the lacquer, copper, or equivalent masters used in manufacturing the disc units of the Album concerned.  If CBS fails to do so you may notify CBS, within thirty (30) days after the end of the three-month period concerned, that you intend to terminate the term of this agreement unless CBS releases the Album within sixty (60) days after CBS' receipt of your notice (the "cure period").  If CBS fails to release the Album before the end of the cure period you may terminate the term of this agreement by giving CBS notice within thirty (30) days after the end of the cure period.  On receipt by CBS of your termination notice the term of this agreement will end and all parties will be deemed to have fulfilled all of their obligations under it except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligation to pay royalties).  Your only remedy for failure by CBS to release an Album will be termination in accordance with this paragraph.  If you fail to give CBS either of those notices within the period specified, your right to terminate under this paragraph 8.05 will lapse.

(b)  (1)  If any such Album is listed among the first sixty (60) Albums in the principal weekly chart of best-selling Albums in the United States published in

BILLBOARD (i.e., the chart titled "TOP LP's & TAPE" during January 1982, or the chart corresponding most closely to that chart if it is re-titled or discontinued), and if you notify CBS of that listing within thirty (30) days after the date of the issue of BILLBOARD in which it first appears, CBS will release that Album in each of the following territories ("Release Territories") within three months after it receives your notice:

> (i)   the United Kingdom;
>
> (ii)   Canada;
>
> (iii)   West Germany;
>
> (iv)   Australia; and
>
> (v)   France.

(2)   If CBS fails to comply with section 8.05(b)(1) in any Release Territory, you may notify CBS, within fifty (50) days after the end of the three-month period concerned, that you intend to invoke this subparagraph 8.05(b) if CBS does not release that Album in that Release Territory within sixty (60) days after CBS' receipt of your notice ("Cure Period"). If CBS fails to do so you will have the right ("Outside License Option") to require CBS to enter into an agreement with a licensee designated by you, who is actually engaged in the business of manufacturing and distributing Phonograph Records in that Release Territory, authorizing the licensee to manufacture and distribute Records derived from the Recordings comprised in that Album in that Release Territory. You may exercise your Outside License Option by giving CBS notice within thirty (30) days after the end of the Cure Period. Your only remedy for failure by CBS to release an Album will be exercise of your Outside License Option in accordance with this subparagraph 8.05(b). If you fail to give CBS either of those notices within the period specified, your rights under this subparagraph will lapse. Fifty percent (50%) of all revenues actually received by CBS under such licenses will be credited to your royalty account under this agreement. Each such license agreement will provide for such compensation for the license as you negotiate with the licensee, and will contain such other provisions as CBS shall require, including but not limited to the following:

> (i)   The licensee will be required to obtain and deliver to CBS, in advance: (A) all consents by other Persons which CBS may require

(including but not limited to consents by recording
artists); and (B)  all agreements by other Persons
which CBS may require to look to the licensee, and not
to CBS, for the fulfillment of any obligations arising
in connection with the manufacture or distribution of
Records under the license (including such agreements
by unions and funds established under union
agreements).  The licensee will also become a first
party to the Phonograph Record Manufacturers' Special
Payments Fund Agreement dated November, 1979, entered
into by CBS with the American Federation of Musicians
of the United States and Canada, or the successor
agreement then in effect.  The license will not become
effective until the licensee has complied with all the
provisions of this subsection (i).

(ii) The licensee will make all payments
required in connection with the manufacture, sale or
distribution in that Release Territory of Phonograph
Records made from those Master Recordings after the
effective date of the license, including, without
limitation, all royalties and other payments to
performing artists, producers, owners of copyrights in
musical compositions, the Music Performance Trust Fund
and Special Payments Fund, and any other unions and
union funds.  The licensee will comply with the
applicable rules and regulations of the American
Federation of Musicians and any other union having
jurisdiction and any other applicable laws, rules and
regulations covering any use of the Recordings by the
licensee or any Person deriving rights from the
licensee, in the manufacture and sale of Phonograph
Records or otherwise.

(iii)  No warranty or representation,
express or implied, will be made by CBS in connection
with the Recordings, the license, or otherwise.  You
and the licensee will indemnify and hold harmless CBS
and its Licensees against all claims, damages,
liabilities, costs, and expenses, including reasonable
counsel fees, arising out of any use of the Recordings
or exercise of such rights by the licensee or any
Person deriving rights from the licensee.

(iv)  CBS will instruct its Licensees in
that Release Territory not to manufacture Records
derived from those Master Recordings for sale there,
except as permitted under subsection 8.05(b)(2)(viii)
below.  If the licensee notifies CBS of such
manufacture CBS will instruct the CBS Licensee
concerned to discontinue it, but neither CBS nor the

CBS Licensee shall have any liability by reason of such manufacture occurring before CBS' receipt of such notice, and CBS shall have no liability by reason of such manufacture at any time.

(v)   Each Record made under the license will bear a sound recording copyright notice identical to the notice used by CBS for its initial United States release of the Recording concerned, or such other notice as CBS shall require.   Otherwise, those Records will not be identified directly or indirectly with CBS.

(vi)   CBS shall have the right to examine the books and records of the licensee and all others authorized by the license to manufacture or distribute Records under the license, for the purpose of verifying the accuracy of the accountings rendered to CBS by the licensee.

(vii)   The licensee will not have the right to authorize any other Person to exercise any rights without CBS' prior written consent.

(viii)   CBS and its Licensees will have the continuing right at all times to manufacture and sell recompilation Albums (defined below) which may contain those Master Recordings in that Release Territory.   (A "recompilation Album" is an Album containing Master Recordings previously released in different Album combinations, such as a "Greatest Hits" or "Best of" Album.)

(c)   The running of each of the three-month and sixty-day periods referred to in subparagraphs 8.05(a) and 8.05(b) will be suspended (and the expiration date of each of those periods will be postponed) for the period of any suspension of the running of the term of this agreement under paragraph 15.03.   If any such three-month or sixty-day period would otherwise expire on a date between October 15 and the next January 16, its running will be suspended for the duration of the period between October 15 and January 16 and its expiration date will be postponed by the same amount of time (i.e., 92 days).   An Album will be deemed released, for the purposes of this paragraph 8.05, when CBS has announced its availability for sale in the territory concerned.

9.   ROYALTIES

9.01.      CBS will pay you a royalty computed at the
applicable percentage, indicated below, of the applicable
Royalty Base Price in respect of Net Sales of Phonograph
Records consisting entirely of Master Recordings recorded under
this agreement during the respective Contract Periods specified
below and sold by CBS or its Licensees Through Normal Retail
Channels ("NRC Net Sales"):

(a)   ON ALBUMS SOLD FOR DISTRIBUTION IN THE UNITED
STATES:

(1)  (i)  Master Recordings made during any
Contract Period :   33%.

(ii)  The royalty rate pursuant to subsection
9.01(a)(1)(i) will apply to the first 500,000 units of
NRC Net Sales in the United States ("USNRC Net Sales")
of each Album consisting of Master Recordings made
during any Contract Period.   The royalty rate will be:

(A)   34%, rather than 33%, on the next
500,000 units of USNRC Net Sales of any such
Album, and

(B)   35% on USNRC Net Sales of any such
Album in excess of 1,000,000 units.

(b)   ON ALBUMS SOLD FOR DISTRIBUTION OUTSIDE THE
UNITED STATES:

(1)   24.75% on Albums sold for distribution in
Canada, the United Kingdom, Germany, France, Belgium,
the Netherlands, Luxembourg, Greece, Japan, New
Zealand and Australia;

(2)   22% on Albums sold for distribution in
Italy, Denmark, Ireland, Norway and Sweden; and

(3)  16.5% on Albums sold for distribution
elsewhere.

(c)   ON SINGLES SOLD FOR DISTRIBUTION IN THE UNITED
STATES:   22%.

(d)   ON SINGLES SOLD FOR DISTRIBUTION OUTSIDE OF THE
UNITED STATES:

(1)  16% on Singles sold for distribution in
Canada, the United Kingdom, Germany, France, Belgium,

the Netherlands, Luxembourg, Greece, Japan, New
Zealand and Australia;

(2)  13% in Singles sold for distribution in
Italy, Denmark, Ireland, Norway and Sweden; and

(3)  11% on Singles sold for distribution
elsewhere.

(e)  <u>ON TWELVE-INCH SINGLES SOLD FOR DISTRIBUTION IN
THE UNITED STATES:</u>  23%.

(f)  <u>ON TWELVE-INCH SINGLES SOLD FOR DISTRIBUTION
OUTSIDE OF THE UNITED STATES:</u>

(1)  17% on twelve-inch singles sold for
distribution in Canada, the United Kingdom, Germany,
France, Belgium, the Netherlands, Luxembourg, Greece,
Japan, New Zealand and Australia;

(2)  14% in twelve-inch singles sold for
distribution in Italy, Denmark, Ireland, Norway and
Sweden; and

(3)  12% on twelve-inch singles sold for
distribution elsewhere.

Royalties on Records sold for distribution outside the United
States will be computed on the same basis as the CBS licensee
concerned accounts to CBS for the Records concerned, but if any
CBS licensee accounts to CBS on the basis of 90% or less of Net
Sales CBS will account to you on the basis of 90% of Net Sales.

9.02.    The royalty rate under paragraph 9.01 on
Phonograph Records (other than audiovisual Records) sold
through any Club Operation shall be 8% and such royalties shall
be computed on the basis of 90% of Net Sales of such Records.
No royalty shall be payable with respect to (a) Phonograph
Records received by members of any such Club Operation in an
introductory offer in connection with joining it or upon
recommending that another join it or as a result of the
purchase of a required number of Records including, without
limitation, records distributed as "bonus" or "free" Records,
or (b) Phonograph Records for which such Club Operation is not
paid.

9.02.1    Notwithstanding clause (a) of the last sentence
of paragraph 9.02, at least 50% of all Phonograph Records
distributed through any Club Operation during the term of this
agreement will be deemed to have been sold.  Such computation
will be made on a cumulative basis, and your royalty account

adjusted accordingly, each sixth accounting period on your request.

9.03.        With respect to the following types of Records, the royalty rate shall be, in lieu of the rate otherwise prescribed, 1/2 of the royalty rate set forth in subsection 9.01(a)(1)(i) or section 9.01(b)(1), 9.01(b)(2) or 9.01(b)(3), depending on the territory concerned:  (a) catalog Phonograph Records sold by CBS' special products operations (hereinafter, "CSP") to educational institutions or libraries, or to other CSP clients for their promotion or sales incentive purposes (but not for sale to the general public through normal retail channels); and on (b)  any Record sold outside the United States by CBS or its principal Licensee in the country concerned in conjunction with a substantial television advertising campaign, during the calendar semi-annual period in which that campaign begins or the next period.  In respect of non-catalog Phonograph Records created on a custom basis for clients of CSP, the royalty rate shall be, in lieu of the rate otherwise prescribed, 1/2 of the royalty rate set forth in subsection 9.01(a)(1)(i) or section 9.01(b)(1), 9.01(b)(2) or 9.01(b)(3), depending on the territory concerned, and the royalty shall be computed on the basis of CSP's actual sales price therefor (less all taxes and Container Charges).  In respect of any Master Recording leased by CBS to others for their distribution of Phonograph Records in the United States, CBS will pay you 50% of CBS net receipts in connection with sales of such Phonograph Records by its Licensee including fifty percent (50%) of the advances which CBS receives from its Licensees solely in respect of a Master Recording made hereunder (provided, however, that you shall not receive a pro-rata share of any such advances CBS receives that are attributable to more than one Master Recording if one or more of such Master Recordings, but not all of such Master Recordings, were made hereunder) computed after deduction of all copyright, AFM and other applicable third party payments; if another artist, a producer, or any other Person is entitled to royalties in respect of such Records, said payment will be divided among you in the same ratio as that among your respective basic royalty percentage rates.

9.04.        (a)  The royalty rate on Phonograph Records (other than audiovisual Records) sold in the form of pre-recorded tape shall be the same as the applicable royalty rate which would have been payable to you if such Records were sold in disc form.

(b)  The royalty on an Audiophile Record will be the amount of money equal to the royalty applicable in the territory concerned, at the beginning of the same accounting period, to:

(1)  a Standard disc unit of the same Record release; or

(2)  a Standard tape unit of the same Record release, if no Standard disc version of it is in the active catalog of CBS (or its principal Licensee in that territory) at that time.

9.05.     (a)  The royalty rate on any Mid-price Record shall be, in lieu of the rate otherwise prescribed (if any), 2/3 of the royalty rate set forth in subsection 9.01(a)(1)(i) or section 9.01(b)(1), 9.01(b)(2) or 9.01(b)(3), depending on the territory concerned.

(b)  The royalty rate on any Budget Record, any Record bearing a Reissue Label or any Record not otherwise covered by this Article shall be, in lieu of the rate otherwise prescribed (if any), 1/2 of the royalty rate set forth in subsection 9.01(a)(1)(i) or section 9.01(b)(1), 9.01(b)(2) or 9.01(b)(3), depending on the territory concerned.

(c)  The royalty rate on a Multiple Record Set will be one-half of the applicable Album royalty rate prescribed in paragraph 9.01, if the Royalty Base Price of that Set is the same as the Royalty Base Price applicable to the top-line single-disc Albums marketed by CBS or its principal Licensee in the territory where the Set is sold at the beginning of the royalty accounting period concerned.  If a different Royalty Base Price applies to a Multiple Record Set, the royalty rate prescribed in the preceding sentence will be adjusted in proportion to the variance in the Royalty Base Price (but will not be more than the applicable Album royalty rate prescribed in paragraph 9.01).  For the purpose of those computations, "top-line" Albums will not include Audiophile Records.  That adjustment of the royalty rate will be made by using the following formula:

(X divided by Y) multiplied by Z = adjusted royalty rate

(subject to the parenthetical limit in the second sentence of this subparagraph).

("X" represents the Royalty Base Price for the Multiple Record Set concerned; "Y" represents the Royalty Base Price for a top-line single-disc Album described in the first sentence of this subparagraph (b), multiplied by the number of disc Records in the Multiple Record Set concerned; and "Z" equals the otherwise applicable royalty rate.)

9.06.     In respect of Phonograph Records derived from Master Recordings furnished by CBS' Licensees to others for

their manufacture and distribution of Records outside the United States, CBS will pay you 50% of the net receipts derived from those transactions by CBS after deduction of all applicable third party payments (which payments will be apportioned as provided in the last sentence of paragraph 9.03 if another artist, a producer, or any other Person is entitled to royalties in respect of such Records), but not in excess of the amount of the royalties which would be payable to you for those Records under subparagraph 9.01(b), 9.01(d) or 9.01(f) if they were manufactured and distributed by CBS or its Licensees.

9.07.    Your royalties on CBS' exploitation of motion pictures for which substantially the entire soundtrack consists of Master Recordings made hereunder ("Pictures") will be determined as follows:

(a)  On Net Sales of audiovisual Records manufactured for distribution by CBS, you will be entitled to a royalty computed as provided in this Article, but at the following percentage rates instead of those specified in paragraphs 9.01 and 9.02:

(1)  ON UNITS SOLD FOR DISTRIBUTION IN THE UNITED STATES:  20% on videodisc units and 15% on videocassettes and all other audiovisual Records.

(2)  ON UNITS SOLD FOR DISTRIBUTION OUTSIDE THE UNITED STATES:  12.5% on videodisc units and 10% on videocassettes and all other audiovisual Records.

(3)  ON UNITS SOLD THROUGH A CLUB OPERATION:  10% of the Club Operation's Selling price.

(b)  On audiovisual Records manufactured for distribution by any Licensee of CBS, and on all other exploitation of Pictures (except exploitation covered by subparagraph 9.07(a)), CBS shall pay you royalties equal to 50% of its Net Receipts (as defined below).  Monies earned and received by CBS Records from any Licensee (rather than monies earned and received by the Licensee) in respect of such exploitation will be included in the computation of Net Receipts.  CBS Records shall negotiate at arm's length with respect to such exploitation with any joint ventures, subsidiaries, wholly or partly owned, and other divisions of CBS Inc.  Net Receipts shall mean all monies ("gross receipts") earned and received by CBS or credited to CBS' account from exploitation of the Picture concerned by means other than audiovisual Records manufactured for distribution by CBS, less a 30% distribution fee, all synchronization license fees paid in connection with the use of non-Controlled Compositions in Pictures, and any

actual out-of-pocket expenses, taxes and adjustments borne by CBS in connection with such exploitation and collection and receipt in the United States of such monies.  If any item of expenses is attributable to receipts in connection with Pictures and other motion pictures, the amount of that expense item which will be deductible in computing New Receipts under this paragraph will be determined by reasonable pro rata apportionment.

(c)  There is no subparagraph 9.07(c).

(d)  The royalties provided in this paragraph 9.07 include any royalty obligations CBS may have to any other Persons who supply services or rights used in or in connection with the audiovisual performances of the Artist, including without limitation producers, extras, and music publishers with respect to Controlled Compositions, and any such royalties shall be deducted from the royalties otherwise payable to you.

9.08.    If CBS licenses Master Recordings hereunder for use in motion picture, television or other soundtracks, it shall credit your account with one-half of the net income derived by CBS in connnection with such licenses.

9.09.    If CBS receives income from the exploition of Master Recordings hereunder in any manner not otherwise specified herein and you are not otherwise compensated therefor, you and CBS shall (if you request) negotiate in good faith with respect to the share of such income payable to you, if any.

## 10. MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in Article 9:

10.01.    In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on a Joint Recording.

10.02.    (a)  With respect to Phonograph Records embodying Master Recordings made hereunder together with other Master Recordings, the royalty rate payable to you shall be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of Sides contained on such Record.  The foregoing shall apply to

audiovisual Records for which royalties are payable under
subparagraph 9.07(a).

(b)  With respect to exploitation of a Picture
together with other audiovisual material and for which
royalties are payable under subparagraph 9.07(b) the following
shall apply in computing Net Receipts:  all monies earned and
received from exploitation of the Picture will equal the
product of (1) all monies earned and received from exploitation
of the Picture and the other audiovisual material together, and
(2) a fraction the numerator of which is the playing time of
the Picture as it is used with the other audiovisual material
and the denominator of which is the total playing time of the
Picture and the other audiovisual material together.

10.03.    Except as otherwise provided in paragraph 10.04,
no royalties shall be payable to you in respect of Phonograph
Records sold or distributed by CBS or its Licensees for
promotional purposes, as cutouts after the listing of such
Records has been deleted from the catalog of CBS or the
particular Licensee, as "free," "no charge" or "bonus" Records
(whether or not intended for resale), or to radio stations.  No
royalties will be payable to you on "sampler" Records in tape
form intended for free distribution to automobile purchasers
and containing not more than two Recordings made under this
agreement.

10.04.    If Albums distributed as "free" or "no-charge"
which are intended for resale Through Normal Retail Channels in
the United States exceed 15% of the total number of Albums
distributed under this agreement for resale Through Normal
Retail Channels in the United States, CBS will pay you your
normal royalty on the excess.

10.05.    If legislation requiring the payment of copyright
royalties for the public performance of Phonograph Records is
enacted in the United States and CBS receives such royalties
with respect to Master Recordings produced under this
agreement, and neither you nor the Artist receives or waives
any similar payment from anyone other than CBS, then CBS will
credit your royalty account with that portion of such royalties
as required by CBS' collective bargaining agreement with the
American Federation of Musicians or the American Federation of
Television and Radio Artists, whichever is applicable.  In
respect of Joint Recordings, that portion will be determined as
provided in paragraph 10.01, unless a different method of
apportionment is required under the applicable collective
bargaining agreement.  If no such agreement applies, CBS will
negotiate with you in good faith regarding the sharing of any
such royalties with you.

ID:  3856e                    -25-                CRU 83-761.2(1)

## 11. ROYALTY ACCOUNTINGS

11.01.    CBS will compute your royalties as of each June 30th and December 31st for the prior six months, in respect of each such six-month period in which there are sales or returns of Records on which royalties are payable to you (or in which reserves hereunder are liquidated).  On the next September 30th or March 31st CBS will send you a statement covering those royalties and will pay you any royalties which are due after deducting unrecouped Advances.  CBS will not act unreasonably in maintaining royalty reserves against anticipated returns and credits.  If CBS makes any overpayment to you, you will reimburse CBS for it; CBS may also deduct it from any payments due or becoming due to you.  If CBS pays you any royalties on Records which are returned later, those royalties will be considered overpayments.  Each royalty reserve will be liquidated equally over the four semi-annual accounting periods following the accounting period during which it is established.  A reserve will not be established for any Album during any semi-annual accounting period in excess of 35% of the aggregate number of units of that Album shipped to CBS' customers.  A reserve will not be established for any Single during any semi-annual accounting period in excess of 40% of the number of units of that Single shipped to CBS' customers, unless CBS anticipates returns and credits which justify the establishment of a larger reserve in its sole discretion.

11.01.1.  If all costs of producing a Picture have been fully recouped, then all gross receipts (as defined in subparagraph 9.07(b)) thereafter accruing under paragraph 9.07 with respect to that Picture shall be credited to the sound-only Record royalty account until they equal the amount of any sound-only Record royalties used to recoup the production costs of that Picture.

11.02.    Sales of Records for distribution outside the United States are called "foreign sales" below.  CBS will compute your royalties for any foreign sale in the same national currency in which CBS's Licensee pays CBS for that sale, and CBS will credit those royalties to your account at the same rate of exchange at which the Licensee pays CBS (or credits CBS' account). For purposes of accounting to you, CBS will treat any foreign sale as a sale made during the same six-month period in which CBS receives its Licensee's accounting and payment (or credit) for that sale.  If any CBS Licensee deducts any taxes from its payments (or credits) to CBS, CBS may deduct a proportionate amount of those taxes from your royalties.  If after a final audit of its tax returns by the Internal Revenue Service CBS is allowed a credit against its U.S. income taxes for all or a portion of any taxes withheld by a CBS Licensee from its royalty remittances to CBS

which were deducted from your royalties, the amount of such tax credit attributable to your royalties will be credited to your account.  The amount of the tax credit to be credited to your account will be determined by CBS; such determination will be conclusive and you will not be entitled to examine CBS' tax returns or any portion of them.  If any law, any government ruling, or any other restriction affects the amount of the payments (or credits) which a CBS Licensee can remit to CBS, CBS may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to CBS.  If CBS cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to you for that sale, except as provided in the next sentence.  CBS will, at your request and at your expense, deduct from the moneys so blocked and deposit in a foreign depository the equivalent in local currency of the royalties which would be payable to you on the foreign sales concerned, to the extent such moneys are available for that purpose, and only to the extent to which your royalty account is then in a fully recouped position.  All such deposits will constitute royalty payments to you for accounting purposes.

11.03.    CBS will maintain books and records which report the sales of the Phonograph Records for which royalties are payable to you.  You may, at your own expense, examine those books and records, as provided in this paragraph only.  You may make those examinations only for the purpose of verifying the accuracy of the statements sent to you under paragraph 11.01.  You may make such an examination for a particular statement only once, and only within three years after the date when CBS sends you that statement under paragraph 11.01.  (CBS will be deemed conclusively to have sent you each statement on the date prescribed in paragraph 11.01 unless you notify CBS otherwise, with respect to any statement, within sixty (60) days after that date.)  You may make those examinations only during CBS's usual business hours, and at the place where it keeps the books and records to be examined.  If you wish to make an examination you will be required to notify CBS at least 30 days before the date when you plan to begin it.  If your examination has not been completed within six months from the time you begin it, CBS may require you to terminate it on thirty days' notice to you at any time; CBS will not be required to permit you to continue the examination after the end of that thirty-day period.  You will not be entitled to examine any manufacturing records or any other records that do not specifically report sales of Phonograph Records, or gratis distributions of Phonograph Records, on which royalties are payable to you.  You may appoint a certified public accountant to make such an examination for you, but not if he or his firm has begun an examination of CBS' books and records for any Person except you unless the examination has been concluded and any applicable audit issues have been resolved.

11.03.1.  Notwithstanding the last sentence of paragraph 11.03, if CBS notifies you that the representative designated by you to conduct an examination of CBS' books and records under paragraph 11.03 is engaged in an examination on behalf of another Person ("Other Examination"), you may nevertheless have your examination conducted by your designee, and the running of the time within which such examination may be made shall be suspended until your designee has completed the Other Examination, subject to the following conditions:

(a)  You shall notify CBS of your election to that effect within 15 days after the date of CBS' said notice to you;

(b)  Your designee shall proceed in a reasonably continuous and expeditious manner to complete the Other Examination and render the final report thereon to the client and CBS; and

(c)  Your examination shall not be commenced by your designee before the delivery to CBS of the final report on the Other Examination, shall be commenced within thirty (30) days thereafter, and shall be conducted in a reasonably continuous manner.

(The preceding provisions of this paragraph 11.03.1 will not apply if CBS elects to waive the provisions of the last sentence of paragraph 11.03 which require that your representative shall not be engaged in any Other Examination.)

11.04.  There is no paragraph 11.04.

11.05.  If you have any objections to a royalty statement, you will give CBS specific notice of that objection and your reasons for it within three years after the date when CBS sends you that statement under paragraph 11.01.  (CBS will be deemed conclusively to have sent you each statement on the date prescribed in paragraph 11.01 unless you notify CBS otherwise, with respect to any statement, within sixty (60) days after that date.)  Each royalty statement will become conclusively binding on you at the end of that three-year period, and you will no longer have any right to make any other objections to it.  You will not have the right to sue CBS in connection with any royalty accounting, or to sue CBS for royalties on Records sold during the period a royalty accounting covers, unless you commence the suit within that three-year period.  If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no

authority to consider any other issues or award any relief
except recovery of any royalties found owing.  Your recovery of
any such royalties will be the sole remedy available to you or
the Artist by reason of any claim related to CBS' royalty
accountings.  Without limiting the generality of the preceding
sentence, neither you nor the Artist will have any right to
seek termination of this agreement or avoid the performance of
your obligations under it by reason of any such claim.  (It is
understood that your remedies shall not be so limited if CBS is
found by final judgment of a court of competent jurisdiction to
have engaged in a pattern of fraud in connection with its
accountings hereunder.  Nothing contained in the preceding
sentence shall be read to mean, or suggest, that CBS has ever
committed fraud in the past or will ever commit fraud in the
future, it being further understood that any such conduct would
be in violation of CBS corporate policy.)

12.  LICENSES FOR MUSICAL COMPOSITIONS

    12.01.    (a)  (1)  You grant to CBS an irrevocable
license, under copyright, to reproduce each Controlled
Composition on Phonograph Records (not including audiovisual
records) and distribute them in the United States and Canada.

        (2)  For that license, CBS will pay
Mechanical Royalties, on the basis of Net Sales, at the
following rates:

        (i)  On Records manufactured for
distribution in the United States:  The rate equal to the
compulsory license rate applicable to the use of musical
compositions on phonorecords under the United States
copyright law at the earlier of the date of Delivery of the
Master Recordings concerned or the last date on which such
Delivery is permitted under Article 3.

        (ii)  On Records manufactured for sale
in Canada:

        (A)  The rate equal to the minimum
compulsory license rate applicable to the use of
musical works on Phonograph Records under the
copyright law of Canada at the earlier of the date of
Delivery of the Master Recordings concerned or the
last date on which such Delivery is permitted under
Article 3, subject to subdivision (B) below.

        (B)  The rate applicable under
this subsection (ii) will be not less than 2¢ per
Composition, and not more than the rate which would be
applicable to the Records concerned under subsection

12.01(a)(2)(i) above if they were manufactured for
distribution in the United States.

The Mechanical Royalty on any Record described in paragraph
9.05 or sold through a Club Operation will be three-fourths
(3/4) of the amount fixed above.  If the Composition is an
arranged version of a public domain work, the Mechanical
Royalty on it will be half of the amount fixed in the first
sentence unless a different rate applies under section
12.01(a)(3) below.  No Mechanical Royalties will be payable for
any Records described in paragraph 10.03.

(3)  If ASCAP or BMI accords regular
performance credit for any Controlled Composition which is an
arranged version of a public domain work, the Mechanical
Royalty rate on that Composition will be apportioned according
to the same ratio used by ASCAP or BMI in determining the
performance credit.  CBS will not be required to pay you at
that rate unless you furnish it with satisfactory evidence of
that ratio.

(b)  (1)  The total Mechanical Royalty for all
Compositions on any Album, including Controlled Compositions,
will be limited to ten times the amount which would be payable
on it under section 12.01(a)(2) if it contained only one
Controlled Composition and if the rate prescribed under
subsection 12.01(a)(2) was the minimum compulsory license rate
for the use of Compositions on Records under the United States
copyright law.  (That minimum statutory rate is currently 4.25¢
per Composition, effective through June 30, 1984.)  The total
Mechanical Royalty on any Single or twelve-inch 'single' will
be limited to twice that amount.  The total Mechanical Royalty
on any Phonograph Record (except an audiovisual Record) that is
not an Album, Single or twelve-inch 'single' will be limited to
four times that amount.

(2)  The maximum Mechanical Royalty under
this subparagraph (b) on a Multiple Record Set will be the same
amount prescribed in section 12.01(b)(1), if the Royalty Base
Price of that Set is the same as the Royalty Base Price
applicable to the top-line single-disc Albums marketed by CBS
or its principal Licensee in the territory concerned at the
beginning of the royalty accounting period concerned.  If a
different Royalty Base Price applies to a Multiple Record Set,
the maximum Mechanical Royalty will be adjusted in proportion
to the variance in the Royalty Base Price (but will not be more
than twice the maximum royalty prescribed in section
12.01(b)(1)).  For the purpose of those computations,
"top-line" Albums will not include Audiophile Records.  That
adjustment of the maximum Mechanical Royalty will be made by
using the following formula:

(X divided by Y) multiplied by Z = adjusted Mechanical
Royalty

(subject to the parenthetical limit in the second sentence
of this section (2).)

("X" represents the Royalty Base Price for the Multiple Record
Set concerned; "Y" represents the Royalty Base Price for a
top-line single-disc Album described in the first sentence of
this subparagraph (b); and "Z" equals the maximum Mechanical
Royalty otherwise applicable under section 12.01(b)(1).)

        (c)  CBS will compute Mechanical Royalties on
Controlled Compositions as of the end of each calendar
quarter-annual period in which there are sales or returns of
Records on which Mechanical Royalties are payable to you (or in
which reserves for Mechanical Royalties hereunder are
liquidated).  On the next May 15th, August 15th, November 15th,
or February 15th, CBS will send a statement covering those
royalties and will pay any net royalties which are due.
Mechanical Royalty reserves maintained by CBS against
anticipated returns and credits will not be held in an
unreasonable amount nor for an unreasonable period of time;
retention of a reserve for two years after it is established
will not be considered unreasonable in any case.  If CBS makes
any overpayment of Mechanical Royalties to any Person you will
reimburse CBS for it; CBS may also recoup it from any payments
due or becoming due to you.  If CBS pays any Mechanical
Royalties on Records which are returned later, those royalties
will be considered overpayments.  If the total amount of the
Mechanical Royalties which CBS pays on any Record consisting of
Master Recordings made under this agreement (including
Mechanical Royalties for compositions which are not Controlled
Compositions) is higher than the limit fixed for that Record
under subparagraph 12.01(b), that excess amount will be
considered an overpayment also.

    12.02.   In respect of all Controlled Compositions
contained in Pictures (as defined in paragraph 9.07), CBS is
hereby granted an irrevocable worldwide, nonexclusive license
to reproduce such Compositions in such Pictures and to
distribute and perform such Pictures, including but not limited
to all audiovisual Records thereof, and to authorize others to
do so.  CBS will not be required to make any payment in
connection with such reproduction, performance or distribution,
and that license will apply whether or not CBS receives any
payment in connection with such reproduction, performance or
distribution.

    12.03.   If the copyright in any Controlled Composition is
owned or controlled by anyone else, you will cause that Person

ID:  3856e                      -31-                    CRU 83-761.2(1)

to grant CBS the same rights described in paragraphs 12.01 and
12.02, on the same terms.  If the copyright in any Controlled
Composition is transferred, the transfer will be made subject
to this agreement.  If any Recordings made under this agreement
contain copyrighted Compositions which are not Controlled
Compositions and are not available to CBS under compulsory
license, you warrant that CBS shall be able to readily obtain
mechanical licenses covering those Compositions for CBS'
benefit on the same terms as those which apply to Controlled
Compositions under this Article 12.

12.04.    You will cause the issuance of effective
licenses, under copyright and otherwise, to reproduce each
Controlled Composition on Phonograph Records and distribute
those Records outside the United States and Canada, on terms
not less favorable to CBS or its Licensees than the terms
generally obtained by Phonograph Record manufacturers in the
country concerned with respect to the use of musical
compositions on Standard Records.

12.05.    You warrant and represent that the "Schedule of
Publishers" appended to this agreement is a complete list of
the music publishers in which you or the Artist has a direct or
indirect interest.

12.06.    It is hereby acknowledged that an amount of
mechanical royalties equal to $70,000 which was to be paid to
certain music publishers pursuant to the letter agreement
between you and CBS dated as of October 21, 1983 regarding the
services of James Mtume (CRU 83-649A(2)) has been timely paid
to such publishers.

13. WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES

13.01.    You warrant and represent:

(a)  You have the right and power to enter into
and fully perform this agreement.

(b)  CBS shall not be required to make any
payments of any nature for, or in connection with, the ·
acquisition, exercise or exploitation of rights by CBS
pursuant to this agreement except as specifically provided
in this agreement.

(c)  Artist is or will become and will remain to
the extent necessary to enable the performance of this
agreement, a member in good standing of all labor unions or
guilds, membership in which may be lawfully required for
the performance of Artist's services hereunder.

ID:  3856e                    -32-                CRU 83-761.2(1)

(d)  No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person.  "Materials," as used in this Article, means:  (1) all Controlled Compositions, (2) each name used by the Artist, individually or as a group, in connection with Recordings made hereunder, and (3) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you, the Artist or any Producer and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

13.02.    During the term of this agreement, neither you nor the Artist will enter into any agreement which would interfere with the full and prompt performance of your material obligations hereunder, and except as provided in paragraph 13.02.1, the Artist will not perform or render any services, as a performing artist, a producer, or otherwise, for the purpose of making Master Recordings or Phonograph Records for any Person except CBS.  The Artist will not perform any "restricted Composition" (defined below) for any Person except CBS for the purpose of making Master Recordings or Phonograph Records, at any time before the later of the following dates:  (a) the date five (5) years after the Recording of the Composition for CBS, or (b) the date two (2) years after the expiration of the term of this agreement.  (A "restricted Composition", for the purposes of this paragraph, is a Composition which shall have been recorded by the Artist for a Master Recording made or delivered to CBS under this agreement or any other agreement with CBS.  "Any other agreement," in this paragraph, means any other agreement relating to the Artist as a recording artist or as a producer of recordings of the Artist's own performances.) Neither you nor the Artist shall authorize or knowingly permit the Artist's performances to be recorded for any purpose without an express written agreement prohibiting the use of such recording on Phonograph Records in violation of the foregoing restrictions.

13.02.1.  The Artist may perform as a producer for the purpose of making Phonograph Records for others, provided:

(a)  You have then fulfilled all of your material obligations under this agreement, and the engagement does not interfere with the continuing prompt performance of your obligations to CBS;

(b)  (1) The Artist's name may be used in a courtesy credit to Epic Records on the Album liners used for such Records, in the form standard for producers in the Record industry, and

(2)   Except as expressly provided in section 13.02.2(b)(1) above, neither the Artist's name (or any similar name) nor any picture, portrait or likeness of the Artist will be used in connection with such Recordings, including, without limitation, on the front covers of Album containers, on sleeves or labels used for single Records, or in advertising, publicity or any other form of promotion or exploitation, without CBS' express written consent, which CBS may withhold in its unrestricted discretion.

(c)   The Artist will not produce any material which the Artist has then recorded for CBS, and will not agree to be restricted from recording the same material for CBS.

(d)   Before the Artist accepts the producer engagement you will notify CBS of the names of the Person for whom the recordings are being made and the Record company which will have the right to distribute the Records.   Your notice will be addressed to CBS' Senior Vice-President, Business Affairs.

13.02.2.   The Artist may perform as a background musician ("sideman") accompanying a featured artist for the purpose of making Phonograph Records for others, provided:

(a)   You have then fulfilled all of your material obligations under this agreement, and the engagement does not interfere with the continuing prompt performance of your material obligations to CBS;

(b)   (1)   The Artist will not render a solo or "step-out" performance, and

(2)   The musical style of the recording will not be substantially similar to the characteristic musical style of Recordings made by the Artist for CBS;

(c)   The Artist will not record any material which the Artist has then recorded for CBS, and will not agree to be restricted from recording the same material· for CBS;

(d)   (1) The Artist's name may be used in a courtesy credit to CBS Records on the Album liners used for such Records, in the same position as the credits accorded to other sidemen and in type identical in size, prominence, and all other respects, and

(2)   Except as expressly provided in section 13.02.1(d)(1) above, neither the Artist's name (or any

ID:   3856e                                    -34-                         CRU 83-761.2(1)

similar name) nor any picture, portrait or likeness of the Artist will be used in connection with such Recordings, including, without limitation, on the front covers of Album containers, on sleeves or labels used for single Records, or in advertising, publicity or any other form of promotion or exploitation, without CBS' express written consent, which CBS may withhold in its unrestricted discretion.

(e)   Before the Artist accepts the sideman engagement you will notify CBS of the names of the Person for whom the recordings are being made and the Record company which will have the right to distribute the Records.   Your notice will be addressed to CBS' Senior Vice-President, Business Affairs.

13.03.   If you or Artist shall become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing re-recording restrictions, you and Artist shall notify CBS thereof and shall cooperate with CBS (at CBS' expense) in the event that CBS commences any action or proceeding against such third party.

13.04.   The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and CBS shall be entitled to injunctive relief to enforce the provisions of this agreement.

13.05.   You will at all times indemnify and hold harmless CBS and any Licensee of CBS from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty or representation made by you in this agreement, provided the claim concerned has been settled or has resulted in a judgment against CBS or its Licensees. Pending the resolution of any claim in respect of which CBS is entitled to be indemnified, CBS will not withhold monies which would otherwise be payable to you under this agreement in an amount exceeding your potential liability to CBS under this paragraph.   If CBS so withholds any monies, it will place such monies in an interest-bearing bank account subject to CBS' policies regarding such accounts.   CBS will promptly notify you of any action commenced on such a claim.   You may participate in the defense of any such claim through counsel of your selection at your own expense, but CBS will have the right at all times, in its sole discretion, to retain or resume control of the conduct of the defense.   If CBS pays more than $5,000 in settlement of any claim not reduced to judgment, you will not be obligated to reimburse CBS for the excess unless you have consented to the settlement, except as provided in the next sentence.   If you do not consent to any settlement proposed by CBS for an amount exceeding $5,000 you will nevertheless be

ID:   3856e                          -35-                    CRU 83-761.2(1)

required to reimburse CBS for the full amount paid unless you make bonding arrangements, satisfactory to CBS in its sole discretion, to assure CBS of reimbursement for all damages, liabilities, costs and expenses (including legal expenses and counsel fees) which CBS or its Licensees may incur as a result of that claim.

14. DEFINITIONS

14.01.   "Master Recording" – every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of phonograph records.

14.02.   "Inception of Recording" – the first recording of performances or other sounds with a view to the eventual fixation of a Master Recording. "Master Recordings from the Inception of Recording" include, without limitation, all rehearsal recordings, "outtakes", and other preliminary or alternate versions of sound recordings which are created during the production of Master Recordings made under this agreement.

14.03.   "Matrix" – any device now or hereafter used, directly or indirectly, in the manufacture of Phonograph Records and which is derived from a Master Recording.

14.04.   "Person" and "Party" – any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

14.05.   "Records" and "Phonograph Records" – all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, including Records of sound alone and audiovisual Records.

14.06.   "Wholesale Price" – (a) with respect to Records (other than audiovisual Records) sold for distribution in the United States or Canada:  (1) the average net price received by CBS from independent distributors for Phonograph Records during the six-month period immediately preceding the accounting period concerned, calculated separately for each separately priced Record series manufactured and sold by CBS; or (2) if there are no applicable independent distributors, CBS' published subdistributor price in effect as of the commencement of the accounting period concerned, less ten percent.

(b) With respect to Records (other than audiovisual Records) sold for distribution outside of the United States and

Canada, one-half of the suggested or applicable retail list price in the country of sale at the commencement of the accounting period concerned. If a different base is used for computing Mechanical Royalties on the Records concerned by agreement between Record manufacturers and a licensing organization, such as BIEM, CBS will use that base instead of the retail list price as the basis for defining the Wholesale Price in computing your royalties on those Records if no retail list price is applicable to them. If neither a retail list price nor an agreed mechanical royalty base is applicable to the Records concerned, the base generally used by CBS' principal Licensee in the country concerned to calculate the royalties it pays to recording artists will be used instead as the basis for defining the Wholesale Price in computing your royalties on those Records. If a base such as the BIEM base is used, and a container charge has been deducted in computing such base, the deducted amount shall be added to the base, and the sum shall be the Wholesale Price.

(c) With respect to audiovisual Records: CBS' published wholesale price (or that of the CBS Licensee concerned) in effect at the commencement of the accounting period concerned.

14.07. "Royalty Base Price" - (a) the applicable Wholesale Price of Phonograph Records less all taxes and less the applicable container charge. The Wholesale Price of audiovisual Phonograph Records sold expressly for rental will be computed so as to include any applicable renewal charges and exclude any trade-in or return fees. The Royalty Base Price for Records sold through any Club Operation will be the same as that for the identical Records Sold Through Normal Retail Channels in the territory concerned.

(b) "Less all taxes" means less all excise, purchase, value added or similar taxes.

14.08. "Container Charge" - The applicable percentage, specified below, of the Wholesale Price of the Records concerned:

(a) Audiovisual Records - 15%.

(b) Other Records - 10% on disc Records and 20% on Records in non-disc configurations.

Container Charges will not be deducted for Singles packaged only in stock paper sleeves.

14.09. "Net Sales" - 85% of gross sales, less returns and credits, computed after deduction of reserves against

anticipated returns and credits, except that in the case of Records sold through any Club Operation, the percentage "85%" shall instead be 100%.  Returns will be apportioned between Records sold and "free goods" in the same ratio in which CBS' customer's account is credited.

14.10.    "Club Operation" — any direct sales to consumers conducted by mail-order or on a membership basis (for example, sales through the Columbia Record Club in the United States or Bertlesmann in Europe).

14.11.    "Contract Period" — the initial period, or any option period, of the term hereof (as such periods may be suspended or extended as provided herein).

14.12.    "Advance" — (a)  a prepayment of royalties.  CBS may recoup Advances from royalties to be paid to or on behalf of you or Artist pursuant to this or any other agreement, except that 20% of the Advances described in the second sentence of paragraph 5.02 shall not be recoupable from royalties payable hereunder other than for exploitation of the Artists performance by audiovisual means.  "Any other agreement," — in this paragraph, means any other agreement relating to the Artist as a recording artist or as a producer of recordings of the Artist's own performances.

(b)  Reference is made to the label agreement between you and CBS dated as of October 21, 1983 (CRU 83-770) (the "Ifland Label Agreement").  If after six Albums have been Delivered under this Agreement, CBS has not accepted either one Artist described in section 1A.01(b)(1) of the Ifland Label Agreement or two Artists described in section 1A.01(b)(2) of the Ifland Label Agreement, then any unrecouped portion of the Advances described in sections 6.02(a)(1) and 6.02(a)(2) of the Ifland Label Agreement may be recouped from the same monies as Advances under this agreement are recoupable from.

(c)  The Advances described in paragraph 6.01.1 of the Ifland Label Agreement shall be recoupable from the same monies as Advances under this agreement are recoupable from.

14.13.    "Composition" — a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

14.14.    "Controlled Composition" — a Composition wholly or partly written, owned or controlled by you, the Artist, a Producer, or any Person in which you, the Artist, or a Producer has a direct or indirect interest.

14.15.    (a)  "Album" - one or more twelve-inch 33 1/3 rpm Records, or the equivalent, at least 35 minutes in playing time, sold in a single package.  (b)  "Single" - a disc Record not more than seven inches in diameter, or the equivalent in a non-disc configuration.  (Audiovisual Records are not Albums or Singles.)  (c) "Twelve-inch single" - a twelve-inch disc Record containing three Sides or less and having less than 35 minutes of playing time, or the equivalent in a non-disc configuration.  (Audiovisual Records are not Albums, Singles, or twelve-inch singles.)

14.16.    "Side" - a Master Recording of a Composition having at least 2 1/4 minutes of playing time.

14.17.    "Joint Recording" - any Master Recording embodying the Artist's performance and any performance by another artist with respect to which CBS is obligated to pay royalties.

14.18.    "Sales Through Normal Retail Channels" - sales other than as described in paragraphs 9.02, 9.03, 9.05, 9.06, and 10.03.

14.19.    "Licensees" - includes, without limitation, subsidiaries, wholly or partly owned, and other divisions of CBS Inc.

14.20.    "Delivery" - (a) when used with respect to Master Recordings - means the actual receipt by CBS of fully mixed, edited, and equalized Master Recordings technically satisfactory to CBS and ready for CBS' manufacture of Phonograph Records, all necessary licenses and applicable approvals and consents, and all materials required to be furnished by you to CBS for use in the packaging and marketing of the Records.  A Master Recording will not be considered technically satisfactory under this agreement unless it is technically satisfactory to CBS for CBS' manufacture and sale of Phonograph Records, and it embodies performances by the Artist that are "first class" (as that term is understood in the record industry) and are at least of the quality of the Artist's prior recorded performances. (See paragraph 4.05 for the number of Compositions performed on Albums made hereunder that are required to be written by the Artist.)

(b)  With respect to any Album made hereunder, if there are less than 350,000 units of USNRC Net Sales of the Preceding Album (as defined in subparagraph 6.02(b)) as of the end of the last month ending prior to the last date on which Delivery of the Album concerned is permitted under Article 3 (as such sales are shown by CBS' trial balance, net of reserves against anticipated returns or credits), then a "commercially

satisfactory" standard shall be substituted for the
"technically satisfactory" standard in the first sentence of
subparagraph 14.20(a) and in subparagraph 4.01(e).  If CBS
agrees to postpone the last date on which Delivery of the Album
concerned is permitted under Article 3, such postponement will
not apply for purposes of the immediately preceding sentence.
For purposes of determining whether a "commercially
satisfactory" standard shall apply, and only for those
purposes, the reserves for the Preceding Album concerned shall
be deemed not to be in excess of 25% of the aggregate number of
units of that Album shipped to CBS' customers, unless CBS
anticipates returns and credits which justify a larger deemed
reserve in its sole discretion.

14.21.    "Reissue Label" - A label, such as the Harmony or
Odyssey label, used primarily for reissues of recordings
released previously.

14.22.    "Budget Record" - A Record bearing a Wholesale
Price more than 40% lower than the Wholesale Price of the top
line Phonograph Records embodying performances of pop artists
released by CBS or its Licensees in the territory concerned.

14.22.1.  "Mid-Price Record" - A Record bearing a Wholesale
Price at least 20% lower than, but not more than 40% lower
than, the Wholesale Price of top line Phonograph Records
embodying performances of pop artists released by CBS or its
Licensees in the Territory concerned.

14.23.    "Multiple Record Set" - An Album containing two
or more 12-inch 33 1/3rpm Records packaged as a single unit, or
the equivalent.

14.24.    "Mechanical Royalties" - Royalties payable to any
Person for the right to reproduce and distribute copyrighted
musical compositions on Phonograph Records.

14.25.    "Special Packaging Costs" - include, without
limitation, all costs incurred by CBS in creating and producing
Album covers, sleeves, and other packaging elements prepared
from material furnished by you or the Artist or used at your
request, in excess of the following amounts:  (a)  $2,500 per
Album for design of artwork (including expenses for
reproduction rights); (b)  $1,600 per Album for engraving; (c)
20¢ per Album unit in disc packaging manufacturing costs for
Albums manufactured for distribution in the United States or
Canada (the "Manufacturing Cost Allowance", below); and (d)
for Albums manufactured for distribution elsewhere, the
standard packaging manufacturing costs incurred by CBS or the
CBS Licensee concerned for disc Albums manufactured in the same
territory as the Album units concerned.  On the earlier of the

date of Delivery of each Album hereunder or the last date on which such Delivery is permitted under Article 3, the Manufacturing Cost Allowance will be increased or decreased in that proportion which the Producer Price Index (defined in the next sentence) then most recently published bears to the Producer Price Index published for April, 1984. ("Producer Price Index", as used in this paragraph, means the Producer Price Index for Finished Goods, seasonally adjusted, maintained by the United States Department of Labor Bureau of Labor Statistics, or corresponding index.)  If there will be any Special Packaging Costs, CBS shall give notice of them before they are incurred, and you may withdraw the material causing such costs.

14.26.     (a)  "Audiophile" Records, units, etc. - Records (other than audiovisual Records) marketed in specially priced catalog series by reason of their superior sound quality or other distinctive technical or artistic characteristics.  (All Records made for digital playback are Audiophile Records.)

(b)  "Standard" Records, units, etc. - Records other than Audiophile Records and Audiovisual Records.

15. REMEDIES

15.01.     If you do not fulfill any portion of your Recording Commitment within the time prescribed in Article 3, CBS may give you notice of such failure and will allow you thirty days after such notice to cure such failure.  If you do not cure such failure within thirty days, then CBS will have the following options, but may not exercise them until at least 90 days have elapsed from the time prescribed in Article 3 for fulfillment of the portion of your Recording Commitment concerned and only if you have not Delivered the applicable portion of your Recording Commitment by the end of such ninety (90) day period:

(a)  to suspend CBS' obligations to make payments to you under this agreement until you have cured the default (but such suspension shall not apply to royalties on sales occurring prior to the end of the accounting period in which the suspension occurs);

(b)  to terminate the term of this agreement at any time, whether or not you have commenced curing the default before such termination occurs; and

(c)  to require you to repay to CBS the amount, not then recouped, of any Advance previously paid to you by CBS and not specifically attributable under Article 6 to an Album which has actually been fully Delivered.

CBS may exercise each of those options by sending you the appropriate notice.  If CBS terminates the term under clause 15.01(b) all parties will be deemed to have fulfilled all of their obligations under this agreement except those obligations which survive the end of the term (such as indemnification obligations, re-recording restrictions, and your obligations under clause 15.01(c).)  No exercise of an option under this paragraph will limit CBS' rights to recover damages by reason of your default, its rights to exercise any other option under this paragraph, or any of its other rights.

15.02.    There is no paragraph 15.02.

15.03.    If because of:  act of God; inevitable accident; fire; lockout, strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or producer; or other cause of a similar or different nature not reasonably within CBS' control; CBS is materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting CBS' rights, CBS shall have the option by giving you notice to suspend the running of the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that CBS shall have no less then thirty (30) days after the cessation of such contingency in which to exercise its option, if any, for the next following Option Period.  If any suspension imposed under this paragraph by reason of an event affecting no Record manufacturer or distributor except CBS continues for more than six (6) months, you may request CBS, by notice, to terminate the suspension by notice given to you within sixty (60) days after its receipt of your notice.  If CBS does not do so, the term of this agreement will terminate at the end of that sixty-day period (or at such earlier time which CBS may designate by notice to you), and all parties will be deemed to have fulfilled all of their obligations under this agreement except those obligations which survive the end of the term (such as warranties, re-recording restrictions, and obligation to pay royalties).

16.  AGREEMENTS, APPROVAL & CONSENT

16.01.    As to all matters treated herein to be determined by mutual agreement, or as to which any approval or consent is required, such agreement, approval or consent will not be unreasonably withheld (unless expressly provided otherwise herein).

ID:  3856e                    -42-              CRU 83-761.2(1)

16.02.     Your agreement, approval or consent, or that of the Artist, whenever required, shall be deemed to have been given unless you notify CBS otherwise within twenty (20) days following the date of CBS' written request to you therefor.

## 17. NOTICES

17.01.     Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph (prepaid), at the addresses shown above, or such other address or addresses as may be designated by either Party.   Notices shall be deemed given when mailed or when transmitted by telegraph, except that notice of change of address shall be effective only from the date of its receipt.   Each notice sent to CBS shall be directed to its Vice-President, Business Affairs, and a copy of each such notice shall be sent simultaneously to CBS Law Department, 51 West 52nd Street, New York, New York 10019, <u>Attention</u>:   Associate General Counsel, Records Section.   CBS will undertake to send a copy of each notice sent to you to George M. Weiss, c/o Rubin, Baum, Levin, Constant and Friedman, 645 Fifth Avenue, New York, New York 10022, but CBS' failure to send any such copy will not constitute a breach of this agreement or impair the effectiveness of the notice concerned.

## 18. EVENTS OF DEFAULT

18.01.     In the event of your dissolution or the liquidation of your assets, or (except as provided in the last sentence of this paragraph) the filing by or against you of a petition for liquidation or reorganization under Title 11 of the United States Code as now or hereafter in effect or under any similar statute relating to insolvency, bankruptcy, liquidation or reorganization, or in the event of the appointment of a trustee, receiver or custodian for you or for any of your property, or in the event that you shall make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent, or in the event you shall fail to fulfill any of your material obligations under this agreement for any other reason, then at any time after the occurrence of any such event, in addition to any other remedies which may be available, CBS shall have the option by notice to require that the Artist render his personal services directly to it for the remaining balance of the term of this agreement, including any extensions thereof, for the purpose of making phonograph records, upon all the same terms and conditions as are herein contained, including, without limitation, the provisions of Articles 3 and 9 hereof.   In such event the Artist shall be deemed substituted for you as a Party to this agreement as of the date of CBS' option exercise.   If such

ID:   3856e                    -43-                    CRU:83-761,2(1)

event is an involuntary petition for liquidation or reorganization, CBS shall allow you 60 days after the occurrence of any such event to cure the event unless such allowance might jeopardize CBS' rights (as determined by CBS in its sole discretion).

19. MISCELLANEOUS

19.01.    There is no paragraph 19.01.

19.02.    (a)  This agreement contains the entire understanding of the Parties relating to its subject matter. No termination of this agreement will be binding upon CBS unless it is made by an instrument signed by an officer of CBS.  No change of this agreement will be binding upon CBS unless it is made by an instrument signed by an officer of CBS and an officer of you.  A waiver by either Party of any provision of this agreement in any instance shall not be deemed to waive it for the future.  All remedies, rights, undertakings, and obligations contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, or obligation of either Party.

(b)  No change of a budget prescribed in this agreement or established under it will be effective unless the change is approved in writing by CBS' Senior Vice President - Business Affairs.

19.03.    Those provisions of any applicable collective bargaining agreement between CBS and any labor organization which are required, by the terms of such agreement, to be included in this agreement shall be deemed incorporated herein.

19.04.    CBS may assign its rights under this agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any Person owning or acquiring a substantial portion of the stock or assets of CBS, or to any partnership or other venture in which CBS participates, and such rights may be assigned by any assignee.  No such assignment shall relieve CBS of any of its obligations.  CBS may also assign its rights to any of its Licensees if advisable in CBS' sole discretion to implement the license granted.

19.05.    Each option and election granted to CBS in this agreement including, without limitation, to suspend the running of one or more periods of time, to terminate the term, to acquire the direct and individual services of a leaving member (if a group artist is involved), or otherwise, is separate and distinct, and the exercise of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by CBS in its notice of exercise of such option or election.

19.06.    Neither Party will be entitled to recover damages or to terminate the term of this agreement by reason of any breach by the other Party of its material obligations, unless the latter Party has failed to remedy the breach within thirty days following notice (or, if the breach concerned cannot be remedied within thirty days, if the latter party commences to remedy it within that time and proceeds to complete the remedy with reasonable promptness).  (The preceding sentence will not apply to any termination by CBS under subparagraph 15.01(b) or to any recovery to which CBS may be entitled by reason of your failure to fulfill your Recording Commitment.)

19.07.    This agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York.  The New York courts (state and federal), only, will have jurisdiction of any controversies regarding this agreement; any action or other proceeding which involves such a controversy will be brought in those courts, in New York County, and not elsewhere.  Any process in any such action or proceeding may, among other methods, be served upon you by delivering it or mailing it, by registered or certified mail, directed to the address first above written or such other address as you may designate pursuant to Article 17.  Any such process may, among other methods, be served upon the Artist or any other Person who approves, ratifies, or assents to this agreement to induce CBS to enter into it, by delivering the process or mailing it by registered or certified mail, directed to the address first above written or such other address as the Artist or the other Person concerned may designate in the manner prescribed in Article 17.  Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York.

19.08.    In entering into this agreement, and in providing services pursuant hereto, you and the Artist have and shall have the status of independent contractors and nothing herein contained shall contemplate or constitute you or the Artist as CBS' agents or employees.

19.09.    This agreement shall not become effective until executed by all proposed Parties hereto.

19.10.    Any and all riders annexed hereto together with this basic document shall be taken together to constitute the agreement between you and CBS.

Ifland Corp.

By_____
        (an authorized signatory)

CBS Records, A Division
    of CBS Inc.

By_____

SR. VICE PRESIDENT, BUSINESS AFFAIRS AND ADMINISTRATION

SCHEDULE OF PUBLISHERS
(appended in accordance with Article 12)

## ARTIST'S ASSENT AND GUARANTY.

To induce CBS Records to enter into the foregoing agreement with Ifland Corp. (CRU 83-761.2(1) (the "Agreement"):

1.  The Artist:

     (a)  represents to CBS that he has read the Agreement and has had the legal effect of each of its provisions explained to him by a lawyer chosen by him;

     (b)  assents to the execution of the Agreement and agrees to be bound by all grants, restrictions, and other provisions of it relating to the Artist; and

     (c)  acknowledges that CBS will have no obligation to make any payments to the Artist in connection with the services rendered by the Artist or the fulfillment of the Artist's other obligations under the Agreement, except for the payments specified in paragraph 5.01 and Article 18.

2.  (a)  The Artist:

          (1)  guarantees, absolutely and unconditionally, the full performance by Ifland Corp. (the "Furnishing Party") of all of the Furnishing Party's obligations under the Agreement; and

          (2)  agrees to indemnify and hold CBS harmless from any loss, damage, liability or expense (including but not limited to attorneys' fees and legal expenses) which arise from any failure by the Furnishing Party to fulfill the Furnishing Party's obligations under the Agreement, or which are incurred by CBS in the enforcement of its rights under this guaranty.  The Artist may participate in the defense of any claim to which this indemnity applies through counsel of his selection at his own expense, but CBS will have the right at all times, in its sole discretion, to retain or resume control of the conduct of the defense.

          (3)  notwithstanding section 2(a)(2), with respect to claims by persons or entities that are not owned, controlled or employed by Artist, or affiliated in any way with Artist or the Furnishing Party, agrees to indemnify and hold harmless CBS and any Licensee of CBS from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by the Furnishing Party of any warranty or

representation made by the Furnishing Party in the
Agreement, provided the claim concerned has been
settled or has resulted in a judgment against CBS or
its Licensees.  Pending the resolution of any claim in
respect of which CBS is entitled to be indemnified,
CBS will not withhold monies which would otherwise be
payable to Artist under the Agreement in an amount
exceeding Artist's potential liability to CBS under
this paragraph.  If CBS so withholds any monies, it
will place such monies in an interest-bearing bank
account subject to CBS' policies regarding such
accounts.  CBS will promptly notify Artist of any
action commenced on such a claim.  Artist may
participate in the defense of any such claim through
counsel of Artist's selection at Artist's own expense,
but CBS will have the right at all times, in its sole
discretion, to retain or resume control of the conduct
of the defense.  If CBS pays more than $5,000 in
settlement of any claim not reduced to judgment,
Artist will not be obligated to reimburse CBS for the
excess unless Artist has consented to the settlement,
except as provided in the next sentence.  If Artist
does not consent to any settlement proposed by CBS for
an amount exceeding $5,000 Artist will nevertheless be
required to reimburse CBS for the full amount paid
unless Artist makes bonding arrangements, satisfactory
to CBS in its sole discretion, to assure CBS of
reimbursement for all damages, liabilities, costs and
expenses (including legal expenses and counsel fees)
which CBS or its Licensees may incur as a result of
that claim.

(b)  The Artist's liability under this guaranty is
direct and immediate, and is not conditioned upon the
pursuit by CBS of any remedy it may have against the
Furnishing Party.  This guaranty shall not be revocable at
any time or for any reason, including, without limitation,
any modification of the Agreement with or without notice to
the Artist.  No failure by CBS to exercise any of its
rights will operate as a waiver of those rights or any
others.

James Mtume

AGREEMENT made as of October 21, 1983 between James Mtume, p/k/a "Mtume" ("you"), c/o Grubman, Indursky & Schindler, P.C., 575 Madison Avenue, New York, New York 10022, and CBS Records ("CBS"), a Division of CBS Inc., 51 West 52nd Street, New York, New York 10019.

1.  The agreement between you and Zembu Productions, Inc. ("Zembu") dated June 24, 1977, as modified (the "1977 Agreement") (Zembu's rights in which have been assigned to CBS), is hereby terminated and replaced with the agreement between Ifland Corp. and CBS dated as of October 21, 1983 (CRU 83-761), which latter agreement is attached hereto.

2.  The rights, obligations and warranties under the 1977 Agreement which survive the end of the term of the 1977 Agreement, including without limitation CBS' obligations to pay royalties and render accountings to you and your right to audit, shall continue in effect after the termination hereunder.

3.  You hereby release CBS from its obligations to make master recordings under the 1977 Agreement.

4.  CBS hereby releases you from your obligations to perform for the making of master recordings under the 1977 Agreement.

James Mtume

CBS Records, a Division of
CBS Inc.

By

SR. VICE PRESIDENT, BUSINESS AFFAIRS AND ADMINISTRATION

ID:  3439e          DFW  CRU 83-761A.2(1)          pgf  4/12/84